**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 3, 2020

*Stqrue, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 3, 2020

*Susan L Carlon*

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of Z.J.G. and M.E.J.G., minor children | ) ) ) | No. 98003-9 |
| DEPARTMENT OF CHILDREN, YOUTH, & FAMILIES | ) ) ) | |
| Respondent, | ) ) | |
| v. | ) ) | EN BANC |
| SCOTT JAMES GREER, | ) ) | |
| Appellant | ) ) | Filed: September 3, 2020 |
| _____ | ) | |

MONTOYA-LEWIS, J.—In Native American communities across the country, many families tell stories of family members they have lost to the systems of child welfare, adoption, boarding schools, and other institutions that separated Native children from their families and tribes. This history is a living part of tribal communities, with scars that stretch from the earliest days of this country to its most recent ones. There are virtually no other statutes more central to rectifying these

wrongs than the Indian Child Welfare Act (ICWA)[1] or state statutes like ICWA's Washington counterpart, the Washington State Indian Child Welfare Act (WICWA).[2]

ICWA and WICWA were enacted to remedy the historical and persistent state-sponsored destruction of Native families and communities. These are baseline protections, passed as a step toward rectifying the horrific wrongs of widespread removal of Native children from their families and states' consistent failure to provide due process to tribes. The acts provide specific protections for Native children in child welfare proceedings and are aimed at preserving the children's relationships with their families, Native communities, and identities. The acts also require states to send notice to tribes so that tribes may exercise their independent rights and interests to protect their children and, in turn, the continuing existence of tribes as thriving communities for generations to come.

During a child custody proceeding, if a court has a "reason to know" that the child at issue is an Indian[3] child, it must apply the protections of ICWA and WICWA. 25 U.S.C. § 1912(a); RCW 13.38.070(1); 25 C.F.R. § 23.107(b)(2). The "reason to know" finding performs a critical gatekeeping function. It ensures that

---

[1] 25 U.S.C. §§ 1901-1963.

[2] Ch. 13.38 RCW.

[3] In this opinion, we use the term "Indian children" or "Indian tribe" when referring to the statutory language that also uses that language. In all other areas, we use the more formal, less colloquial term "Native" or "Native American."

the court applies the heightened ICWA and WICWA standards early on in any proceeding and ensures that tribes receive adequate notice of the proceeding in order to protect their children and the tribes' sovereign interests. The purposes of ICWA and WICWA require their correct application to advance and realize their promises.

At issue in this case is whether the court had "reason to know" that M.G and Z.G. were Indian children at a 72-hour shelter care hearing. We hold that a trial court has "reason to know" that a child is an Indian child when a participant in the proceeding indicates that the child has tribal heritage. We respect that tribes determine membership exclusively, and state courts cannot establish who is or is not eligible for tribal membership on their own. Further, we follow the canon of construction for interpreting statutes that deal with issues affecting Native people and tribes, which requires that we construe these statutes in favor of the tribes. Finally, we are bound by the statutory language and implementing regulations of ICWA and WICWA, and we interpret these acts to serve their underlying purposes. Given these guiding principles, we hold that an indication of tribal heritage is sufficient to satisfy the "reason to know" standard.

Here, participants in a shelter care hearing indicated that M.G. and Z.G. had tribal heritage. The trial court had "reason to know" that M.G. and Z.G. were Indian children, and it erred by failing to apply ICWA and WICWA standards to the proceeding. We reverse.

## I. FACTS AND PROCEDURAL HISTORY

A.    Factual Background

On June 27, 2018, the Kent Police Department removed minor children, Z.G. and M.G., from the care of their parents, S.G. (father) and L.G. (mother). The police took the children into protective custody due to concerns of neglect and unsanitary living conditions. At the time, Z.G. was 21 months old, and M.G. was 2 years old. On June 29, 2018, the Department of Children, Youth, and Families (the Department) filed dependency petitions for Z.G. and M.G. In the petitions, the Department stated:

> Based upon the following, the petitioner *knows or has reason to know the child is an Indian child* as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do apply to this proceeding:
>
> Mother has Tlingit-Haida[4] heritage and is eligible for membership with Klawock Cooperative Association. She is also identified as having Cherokee heritage on her paternal side. Father states he may have native heritage with Confederated Tribes of the Umatilla in Oregon.
>
> The petitioner has made the following preliminary efforts to provide notice of this proceeding to all tribes to which the petitioner knows or has reason to know the child may be a member or eligible for membership if the biological parent is also a member:
>
> Inquiry to tribes has been initiated. Worker has called Central Council Tlingit Haida regarding this family and petition. Further inquiry and notification to tribes ongoing.

---

[4] The Central Council of the Tlingit and Haida Indian Tribes of Alaska shorten their name to Tlingit & Haida. The record, however, uses variations of "Tlingit-Haida" and "Tlingit and Haida." We use the Tribes' preferred shortening throughout, except when the wording is a direct quote from the record.

Clerk's Papers (CP) at 2 (emphasis added).

On July 2 and 3, 2018, a shelter care hearing took place to determine whether the children could be immediately and safely returned home while the adjudication of the dependency was pending. RCW 13.34.065(1)(a). Richard Summers—the social worker who submitted the dependency petition—the father, and the mother all testified at the hearing. Summers testified first. The court began the inquiry by asking if the contents of the dependency petitions Summers submitted were correct. Summers responded that they were and testified that he wished to incorporate the contents of the petitions as part of his testimony. However, when asked whether the children qualified under WICWA, Summers responded, "To my knowledge, not at this time." 1 Verbatim Report of Proceedings (VRP) (July 2, 2018) at 11. The Department asked about Summers' investigation up to that point, and Summers detailed the efforts he had made in the last few days: "I called the Tlingit and Haida Indian tribes of Alaska, and they gave me information that the maternal grandmother is an enrolled member, but the mother is not enrolled, and the children are not enrolled. And to my knowledge, the father is not enrolled in a federally recognized tribe either." *Id.* at 11-12. During cross examination, Summers confirmed that in the dependency petition, he had indicated that the mother is eligible for tribal membership, and he also confirmed that it was possible the children were eligible for tribal membership.

5

The father, S.G., testified that it was his understanding that the children's mother is of Central Council of the Tlingit and Haida Indian Tribes of Alaska (Tlingit & Haida) heritage and that she is eligible for tribal membership in the Klawock Cooperative Association of American Indians (KCA). He also testified that the mother has Cherokee heritage and that he has "native heritage with the confederated tribes of the Umatilla in Oregon." 2 VRP (July 3, 2018) at 67. The father testified that it was his understanding that his children were eligible for tribal membership.

The mother testified that she was eligible for tribal membership in Tlingit & Haida and that her children were also eligible for tribal membership in the same tribes. She also indicated that she was not an enrolled member of a federally recognized tribe at that time.

In its oral ruling, the court determined:

> So just as a threshold issue, as far as the application of ICWA, based on testimony of the social workers, frankly, as well as the testimony of both the parents, I'm going to make a finding that ICWA does not apply to these cases at this point based on the evidence presented and the reasonable cause standard.

*Id.* at 118. The court went on to apply the non-ICWA emergency removal standard and found that the Department met its burden to show "that there's a serious risk of substantial harm to the boys in this case." *Id.* The court did not utilize the placement preferences outlined in ICWA and, instead, placed Z.G. and M.G. in licensed foster

6

care, despite the availability of placements that were culturally appropriate.[5] In the court's written shelter care order, the court found, "Based upon the following, there is not a reason to know the child is an Indian child . . . : Mother and father are not enrolled members in a federally recognized tribe. Maternal grandmother is enrolled member, Department continuing to investigate. Mother believes she's eligible for tribal membership." CP at 10.

After the children had been in licensed foster care for close to a month, on July 30, 2018, Tlingit & Haida successfully intervened in the case on behalf of KCA. KCA determined that M.G. and Z.G. are tribally enrolled members. The court later entered a dependency order as to the father's parental rights and, consistent with the tribal intervention, determined that there was "reason to know" Z.G. and M.G. were Indian children, and applied ICWA and WICWA. *Id.* at 19, 59.

B.    Procedural History

The father moved for discretionary review of the shelter care order.[6] The Court of Appeals commissioner granted review and found that although the father's

---

[5] We recognize that there is limited availability of licensed tribal or Native foster care homes, but that does not excuse the Department's duty to identify culturally appropriate placements for Native children. 25 U.S.C. § 1915.

[6] After oral argument on the motion for discretionary review, the Department supplemented the record with written responses from the Confederated Tribes of the Umatilla Indian Reservation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma, all confirming that Z.G. and M.G. are not enrolled or eligible to enroll in their tribes.

appeal of the shelter care order was technically moot, the issues were of continuing

and substantial public interest, so review was appropriate. [7]

The Court of Appeals affirmed the trial court's shelter care order, finding that

the trial court had no "reason to know" the children were Indian children. *In re*

*Dependency of Z.J.G.*, 10 Wn. App. 2d 446, 450, 448 P.3d 175 (2019). The Court of

Appeals reasoned that a trial court has "reason to know" a child is an Indian child

when the court "receives evidence that the child is a tribal member or the child is

eligible for tribal membership and a biological parent is a tribal member." *Id.* at 449.

The court concluded that in this case, "at the time of the shelter care hearing, good

---

[7] We agree that this case presents issues of continuing and substantial public interest, and conclude that review is appropriate despite its mootness. "'A case is moot if a court can no longer provide effective relief.'" *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004) (quoting *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984)). Generally, this court will not review a moot case; but we will review the case if it presents issues of continuing and substantial public interest. *Id.* In deciding whether a case presents issues of continuing and substantial public interest, we consider whether the issues are of a public or private nature, whether an authoritative determination is desirable to provide future guidance to public officers, and whether the issues are likely to recur. *Id.* at 892 (quoting *Westerman v. Cary*, 125 Wn.2d 277, 286-87, 892 P.2d 1067 (1994)). We also consider the likelihood that the issue will escape review and the adverseness and quality of the advocacy. *Id.* (quoting *Westerman*, 125 Wn.2d at 286-87). The correct application of ICWA and WICWA are issues of a public nature, and clarification of the "reason to know" standard will provide guidance to trial courts on how to proceed with ICWA cases. These issues are also likely to recur. Child custody proceedings take place each day in our state courts, and the correct application of ICWA and WICWA is essential to the proper function of these proceedings. Due to the short-lived, but critical, nature of shelter care hearings, this case also presents an opportunity to address a scenario that would often escape review. Finally, the advocacy here has been genuinely adverse and includes amici briefs from Tlingit & Haida and the KCA, the Legal Counsel for Youth and Children, Northwest Justice Project, and Washington Defender Association, as well as a brief from American Indian Law Professors, Center for Indian Law and Policy, the Fred T. Korematsu Center for Law and Equality, and the American Civil Liberties Union of Washington. This case satisfies each consideration for establishing an issue of continuing and substantial public interest. Further, the Department did not argue that the case was moot during oral argument.

faith investigation had not yet revealed evidence a parent or a child was a tribal member[,]" so the trial court "did not err in concluding there was no reason to know the children were Indian children." *Id.* at 450.

The father sought review in this court, which we granted. 195 Wn.2d 1008 (2020).

## II. ANALYSIS

### A. Standard of Review

The applicability of ICWA and WICWA is a question of law we review de novo. *In re Adoption of T.A.W.*, 186 Wn.2d 828, 840, 383 P.3d 492 (2016). Statutory and regulatory interpretation is also a question of law that we review de novo. *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 80, 90, 392 P.3d 1025 (2017). "We interpret administrative regulations using rules of statutory construction." *Id.* The purpose of our inquiry is to determine legislative intent and interpret the statutory provisions in a way that carries out that intent. *Id.* at 91. We first consider the statute's plain language. *T.A.W.*, 186 Wn.2d at 840. "'If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction.'" *Id.* (quoting *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009)). Plain meaning "is derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky v. Olsen*, 179 Wn.2d 756, 762,

317 P.3d 1003 (2014) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)). However, if the statute is subject to more than one reasonable interpretation, we "'may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent.'" *Id.* (quoting *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007)).

ICWA and WICWA are interpreted coextensively, barring specific differences in their statutory language. *T.A.W.*, 186 Wn.2d at 844. If the federal and state protections differ, we apply the more protective provision. 25 U.S.C. § 1921. Moreover, statutes that deal with issues affecting Native people and tribes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985).

Our plain language analysis requires an understanding of the context in which the contested provision is found, and the purposes of each act must guide our interpretation, so we begin with the background to the passage of each act. *See T.A.W.*, 186 Wn.2d at 841.

B.      Background of ICWA and WICWA[8]

Congress passed ICWA in 1978 in response to a lengthy and concerted effort

by tribal leaders who sought to end the wholesale removal of Indian children from

their families by state and private agencies. *See Miss. Band of Choctaw Indians v.*

*Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989); *Indian Child*

*Welfare Program: Hearings before the Subcomm. on Indian Affairs of the S. Comm.*

*on     Interior    and    Insular    Affairs*,    93d    Cong.    (1974)

https://www.narf.org/nill/documents/icwa/federal/lh/hear040874/hear040874.pdf

[https://perma.cc/Z6HJ-TNGE] (hereinafter *1974 Senate Hearings*); *see also Indian*

*Child Welfare Act of 1977: Hearing on S. 1214 before the U.S. S. Select Comm. on*

*Indian        Affairs*,        95th        Cong.        76-84        (1977)

https://www.narf.org/nill/documents/icwa/federal/lh/hear080477/hear080477.pdf

[https://perma.cc/7CC7-DFWQ] (hereinafter *1977 Senate Hearings*). Congress

acted after finding that an "alarmingly high percentage of Indian families are broken

---

[8] This opinion cannot summarize the full history of the egregious and widespread conduct that predicated the passage of ICWA and WICWA. Instead, it endeavors to contextualize the precise question presented. To appreciate the true scope of the federal and state actions, see Judge Tim Connors, *Our Children Are Sacred: Why the Indian Child Welfare Act Matters*, Judges' J., Spring 2011, at 33 and Karen Gray Young, Comment, *Do We Have It Right This Time? An Analysis of the Accomplishments and Shortcomings of Washington's Indian Child Welfare Act*, 11 Seattle J. for Soc. Just. 1229 (2013). *See also* Matthew L.M. Fletcher & Wenona T. Singel, *Indian Children and the Federal-Tribal Trust Relationship*, 95 NEB. L. REV. 885 (2017); Nick Estes & Alleen Brown, *Where Are the Indigenous Children Who Never Came Home?*, HIGH COUNTRY NEWS (Sept. 25, 2018), https://www.hcn.org/articles/tribal-affairs-where-are-the-indigenous-children-that-never-came-home-carlisle-indian-school-nations-want-answers [https://perma.cc/8YD6-4FE3].

up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(4). The empirical data showed that Native children were separated from their families at significantly higher rates than non-Native children, and in "some States, between 25 and 35 percent of Indian children were living in foster care, adoptive care, or institutions." ICWA Proceedings, 81 Fed. Reg. 38,778, 38,780 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23) (citing H.R. REP. NO. 95-1386, at 9 (1978)). This history of centuries of policies of removal and assimilation predates ICWA; the removal of children from their families and tribal communities and placement in foster care or adoption is but one of the many atrocious governmental policies intended to destabilize Native communities and ultimately end them.

The removal of Native children from their homes happened without due process or notice to the tribes. H.R. REP. NO. 95-1386, at 11 (1978); ICWA Proceedings, 81 Fed. Reg. at 38,780. Often, state officials—frequently supported by private, for-profit adoption agencies—would remove a Native child without notice to tribal authorities or an explanation to the parents, resulting in gross violations of due process, which were "quite commonplace when . . . dealing with Indian parents and Indian children." *1974 Senate Hearings* at 67 (testimony of Bertram Hirsch, Staff Attorney, Association of American Indian Affairs). Washington State also

12

engaged in removals without due process, which left tribes and families without a way to find their children. The children themselves would often never learn of their true homes, and many were not raised with the knowledge that they were Native children or tribal members. In 1974, tribal leaders testified before Congress about the problems Native families and tribes faced under current state child welfare practices. Mel Sampson recounted a statement of an adopted child who said, "My second grade teacher was the one that told me I was an Indian . . . . My adoptive parents told me when I was between the age of 9 and 10 . . . not mentioning a tribe or where I was from." *Id.* at 117 (statement of Mel Sampson, Northwest Affiliated Tribes, Washington State; accompanied by Louie Cloud, Vice Chairman, Yakima[9] Tribal Council). Roger R. Jim Sr. explained multiple occasions of Native children being removed from their homes in Washington and taken across the country for adoptions without tribal notice. *Id.* at 119 (statement of Roger R. Jim Sr., Yakima Tribal Councilman, President, Affiliated Tribes of Northwest Indians).

The states' widespread removal of Indian children without notice presented a serious threat not only to the family and children but also to the existence of tribes as self-governing communities. ICWA Proceedings, 81 Fed. Reg. at 38,781. This

---

[9] "In the mid-1990s the Yakima nation renamed itself to 'YAKAMA' more closely reflecting the proper pronunciation in their native tongue." *Yakama Nation History*, YAKAMA NATION, http://www.yakamanation-nsn.gov/history3.php [https://perma.cc/Z95V-2884] (last visited Aug. 6, 2020). These hearings predated Yakama Nation's name change, so the original source uses the antiquated spelling.

form of removal compounded the traumatic effect of a centuries-long practice of separating Native families and children from each other and their tribes of origin. Congress addressed this ongoing crisis of removal and adoption by incorporating robust notice provisions into ICWA to ensure that tribes have the opportunity to intervene in proceedings that separate tribal children from their families. *Id.*; 25 U.S.C. § 1912(a). Under ICWA, a tribe has the right to exercise tribal court jurisdiction over a child custody proceeding involving an Indian child. 25 U.S.C. § 1911(a), (b). A tribe also has a right to become a party to a suit in state court and protect its own rights and interests in the proceeding. 25 U.S.C. § 1911(c).

Without notice, tribes cannot exercise these rights. Congress sought to preserve the integrity of tribes as self-governing and sovereign entities by ensuring, through notice, that tribes can act to protect the future and integrity of both the tribes themselves and their families. *See* ICWA Proceedings, 81 Fed. Reg. at 38,781. Congress's passage of ICWA protected not only the sovereignty of tribes but their continued existence.

Removal caused—and continues to cause—lasting trauma for both individuals and tribes, as well as a disconnection between individuals and their tribal communities. Ramona Bennett, Chairwoman of the Puyallup Tribe of Indians, recounted to the Senate the long-lasting trauma that removals have on Native children and Native families:

> [M]any of these adopted ones come back to me. Some are our tribal members. Many of them are from Indian nations all over the country. They tell horror stories about the things that have happened to them, including their lack of identity, their loss of self-esteem; it is a real tragedy.
>
> These kids are in foster care or out of Indian communities, and they find themselves never being appreciated and never measuring up. They are accepted only if they compromise themselves as Indian human beings, compromise themselves and alter their values.

*1977 Senate Hearings* at 164 (statement of Ramona Bennett, Chairwoman, Puyallup Tribe). This trauma was particularly widespread in Washington. In a 1976 report, Washington was listed as one of the 10 worst states by rate of Indian placements, with 13 times more Indian children placed in foster and adoptive care compared to non-Indian children. TASK FORCE FOUR: FED., STATE, & TRIBAL JURISDICTION, 94TH CONG., REP. ON FEDERAL, STATE, AND TRIBAL JURISDICTION 181, 238 (Comm. Print 1976), https://www.narf.org/nill/documents/icwa/federal/lh/76rep/76rep.pdf [https://perma.cc/TJK2-Z76E].[10]

The impacts of the removal of Native children on tribes has been studied fairly extensively, but the impact on individual Native children has been studied less so. In 2017, the first study to compare the mental health outcomes of Native adoptees

---

[10] Notably, Native children continue to be far overrepresented in child welfare cases in Washington state courts. NAT'L COUNCIL OF JUVENILE & FAMILY COURT JUDGES, DISPROPORTIONALITY RATES FOR CHILDREN OF COLOR IN FOSTER CARE 6 (2015), https://www.ncjfcj.org/wp-content/uploads/2017/09/NCJFCJ-Disproportionality-TAB-2015_0.pdf [https://perma.cc/4BVH-G6PC].

and White adoptees showed that Native adoptees have unique experiences. Based on its preliminary quantitative research, the study concluded,

> It appears that AI [(American Indian)] adoptees are even more vulnerable to mental health problems within the adoptee population. AI adoptees compared to White adoptees were more likely to report alcohol addiction, alcohol recovery, drug addiction, drug recovery, self-assessed eating disorder, eating disorder diagnosis, self-injury, suicidal ideation, and suicide attempt.

Ashley L. Landers, Sharon M. Danes, Kate Ingalls-Maloney, Sandy White Hawk, *American Indian and White Adoptees: Are There Mental Health Differences?*, 24 AM. INDIAN & ALASKA NATIVE MENTAL HEALTH RES., no. 2, 2017, at 54, 69.

As Landers et al. note, "storytelling is a major activity in AI culture, having adoptees seek the stories of their own ancestors begins to fill the 'hole' created by being torn from their families of origin. AI adoptees sharing their own stories gives relevance to their history and elicits more healing." *Id.* at 70. One of the study's authors, Sandy White Hawk, speaks nationally and tells her story of removal from her biological home. She recalls being pulled out from under a table where she had hidden from the White man and woman who came to her house to take her; at 18 months, she was removed from her family and adopted by this White couple, and she was raised in a town in which she was the only Native person. She endured abuse at home and abuse at school. It was not until her adult years that she learned where she had come from and began a decades-long process of returning to her Sicangu Lakota homeland, where she reconnected with her brother and other relatives and

16

learned the Lakota language. Her mother died young, mourning, as White Hawk says, "not having her baby with her."[11] White Hawk has become a national expert on the unique adoption trauma Native children, who are now adults, have suffered, and she is the leader of a movement toward the repatriation of Native adoptees, many of whom have no idea which tribes they come from or the circumstances of their removal. The storytelling and repatriation processes White Hawk describes are critical to healing the wounds created by these long-term policies of removal. ICWA is meant to prevent the trauma of removal in the first instance, whenever possible.

Yet, since the passage of ICWA, state courts have undermined ICWA protections and ignored tribes' exclusive role in determining their own membership. For example, state courts created an exception to the application of ICWA by determining that ICWA should not apply when it finds that an Indian child is not part of an "existing Indian family." *In re Adoption of Baby Boy L.*, 231 Kan. 199, 205-07, 643 P.2d 168 (1982), *overruled by In re A.J.S.*, 288 Kan. 429, 204 P.3d 543 (2009); *accord In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Claymore v. Serr*, 405 N.W.2d 650, 654 (S.D. 1987); *In re Adoption of Baby Boy D*, 1985 OK 93, 742 P.2d 1059, 1064, *overruled in part by In re Baby Boy L.*, 2004 OK 93, 103 P.3d 1099. Before applying ICWA protections to a proceeding, state courts would examine the child and their family and unilaterally determine the "Indian-ness" of

---

[11] *See* BLOOD MEMORY: A STORY OF REMOVAL AND RETURN (Vision Maker Media 2019).

each. ICWA Proceedings, 81 Fed. Reg. at 38,782. Even if the court knew the child was a member of a tribe, if the state court deemed that the child was not from an "existing Indian family," it would deny ICWA protections. *Baby Boy L.*, 231 Kan. at 202-06. As a result, even children who met the statutory definition of "Indian child," their families, and their tribes were denied the protections that Congress established. ICWA Proceedings, 81 Fed. Reg. at 38,782.

This court endorsed the "existing Indian family" exception in *In re Adoption of Infant Boy Crews*, 118 Wn.2d 561, 825 P.2d 305 (1992), *overruled in part by T.A.W.*, 186 Wn.2d at 858. In *Crews*, Tammy Crews attempted to vacate the order terminating her parental rights. *Id.* at 565. Crews grew up in Washington and was unaware of her specific tribal affiliation at the time her parental rights were terminated. *Id.* at 563, 565. On appeal, the Choctaw Nation of Oklahoma intervened in the case and determined that both Crews and the child were members. *Id.* at 566.

We determined that since the child "has never been a part of an existing Indian family unit or any other Indian community," ICWA did not apply. *Id.* at 569. In concluding that there was no "existing Indian family unit" to protect, we reasoned that "[n]either Crews nor her family has ever lived on the Choctaw reservation in Oklahoma and there are no plans to relocate the family from Seattle to Oklahoma." *Id.* Further, "there is no allegation by Crews or the Choctaw Nation that, if custody were returned to Crews, [the child] would grow up in an Indian environment," and

18

"Crews has shown no substantive interest in her Indian heritage in the past and has given no indication this will change in the future." *Id.* Thus, we affirmed the decision not to apply ICWA, despite conclusive evidence that the child was an Indian child, based on the tribe's determination.

This is precisely the type of reasoning a correct application of ICWA would prevent. One of ICWA's main purposes was to interrupt state policies that contributed to the large scale and ongoing genocide of Native people, through the removal of children, which was part of assimilationist policies begun in the 1800s to "Kill the Indian and Save the Man."[12] *Yet we relied on the success of those very policies to deny ICWA's protections. Id.* at 565. We commented that Crews "testified that her family does not regularly participate in any Indian practices or events," relying on the family's lack of connection with a tribal community in order to justify denying ICWA and WICWA protections that were clearly applicable. *Id.*

It was not until decades later, in 2016, in *In re Adoption of T.A.W.*, that we overruled *Crews* and reconsidered our adoption of the "existing Indian family" exception. 186 Wn.2d at 858. However, the Bureau of Indian Affairs' (BIA)

---

[12] Title of Captain Richard H. Pratt's speech to George Mason University in which he laid out his plan for educating Native children in residential boarding schools, a policy the federal government adopted and carried out from the 1890s through the 1950s. *"Kill the Indian, and Save the Man": Capt. Richard H. Pratt on the Education of Native Americans*, CARLISLE INDIAN SCH. DIGITAL RESOURCE CTR., http://carlisleindian.dickinson.edu/teach/kill-indian-and-save-man-capt-richard-h-pratt-education-native-americans (last visited July 28, 2020) [https://perma.cc/3QTG-X3HZ].

19

regulations confirm that *Crews* was wrong when it was decided; "there is not an 'existing Indian family' exception to ICWA." ICWA Proceedings, 81 Fed. Reg. at 38,815. In fact, the first time the BIA exercised its authority to create binding regulations, it did so in response to decisions and policies of state courts that impermissibly lowered the protections of ICWA, such as the invalid "existing Indian family" exception. *Id.* at 38,782.

In 2011, Washington joined several other states in enacting its own version of ICWA. In general, these statutes may clarify ICWA or add protections to child custody proceedings involving Indian children, but they may not lower ICWA protections. 25 U.S.C. § 1921. WICWA is meant to promote practices designed to prevent placing Indian children out of the home inconsistent with the rights of the parents; the health, safety, or welfare of the children; or the interests of their tribe(s). RCW 13.38.030. Its express intent is to be a "step in clarifying existing laws and codifying existing policies and practices." *Id.*; *see also T.A.W.*, 186 Wn.2d at 843 (noting that while ICWA does not provide a definition of "active efforts," WICWA does). WICWA also states that "[n]othing in this chapter shall affect, impair, or limit rights or remedies provided to any party under the federal Indian child welfare act." RCW 13.38.190(2). WICWA is meant to strengthen Washington's enforcement of the fundamental protections that ICWA guarantees to an Indian child, their parents, and their tribe(s).

Washington still has work to do. As of 2015, American Indian and Alaskan Native children in Washington were represented in foster care at a rate 3.6 times greater than they were in the general child population of the state. NAT'L COUNCIL OF JUVENILE & FAMILY COURT JUDGES, DISPROPORTIONALITY RATES FOR CHILDREN OF COLOR IN FOSTER CARE 6 (2015), https://www.ncjfcj.org/wp-content/uploads/2017/09/NCJFCJ-Disproportionality-TAB-2015_0.pdf [https://perma.cc/4BVH-G6PC]. This was well above the national average. *Id.* Regrettably, the disproportionate rate of representation of Native children in the Washington state child welfare system has not changed significantly since 2008, when the Washington State Institute for Public Policy (WSIPP) published *Racial Disproportionality in Washington State's Child Welfare System.* MARNA MILLER, WASH. STATE INST. FOR PUB. POLICY, RACIAL DISPROPORTIONALITY IN WASHINGTON STATE'S CHILD WELFARE SYSTEM (2008) https://www.wsipp.wa.gov/ReportFile/1018/wsipp_Racial-Disproportionality-in-Washington-States-Child-Welfare-System_Full-Report.pdf [https://perma.cc/FV7M-D29Y]. WSIPP found that Native children were almost five times more likely than White children to be removed from their parents' care and six times more likely to have open cases for two years or longer. *Id.* at 8. These statistics indicate that continued commitment to the robust application of ICWA and WICWA is needed to address ongoing harms of Indian child removals.

21

The history of removal and displacement of Native people from their communities, the important role notice plays in a tribe's ability to effectuate its rights under these acts, and our court's history of ignoring ICWA protections all inform our understanding of the "reason to know" standard. To ignore that history and its impacts on today's child welfare system in Washington and elsewhere undermines the purposes of ICWA (and WICWA).

C.    "Reason To Know" under ICWA and WICWA

Law enforcement officers may take a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and if the child might be injured if it were necessary to first obtain a court order. RCW 26.44.050. Within 72 hours of removal, the court must conduct a shelter care hearing to determine whether the child can be immediately and safely returned home while the adjudication of the dependency is pending. RCW 13.34.065(1)(a).

During a child custody proceeding, ICWA and WICWA provide mechanisms to protect tribal interests and prevent the improper removal of Indian children.[13] Tribes have the right to exercise their jurisdiction over child custody proceedings involving Indian children or to intervene as a party in a state court proceeding. 25 U.S.C. § 1911 (a) (describing when a tribe has exclusive jurisdiction), (b) (describing

---

[13] ICWA and WICWA apply in any involuntary child custody proceeding that involves an Indian child. 25 C.F.R. § 23.103; RCW 13.38.020, .040. There is no dispute that a shelter care hearing is an involuntary child custody proceeding.

when a tribe has a right to have a proceeding transferred to tribal court), (c) (describing when a tribe may intervene). Tribes can also act in their sovereign capacity to determine whether a child is a member of their tribe. 25 C.F.R. § 23.108. These tribal interests are protected by the notice provision in ICWA and WICWA. 25 U.S.C. § 1912(a); RCW 13.38.070(1). Without notice, tribes are at risk of not knowing that a child custody proceeding dealing with one of their children is occurring.

ICWA also provides increased protections for Indian children. These protections include identifying placement preferences within the child's tribal community. 25 U.S.C. § 1915. ICWA also provides a higher standard for removing children from their home and for the termination of parental rights. *Compare* 25 U.S.C. § 1912(e) (requiring clear and convincing evidence that the parent's continued custody is likely to result in serious emotional or physical damage to the child in order to remove a child), *and* 25 U.S.C. § 1912(f) (requiring evidence beyond a reasonable doubt that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child in order to terminate parental rights), *with* RCW 13.34.130 (allowing removal based on a preponderance of the evidence that the child is dependent), *and* RCW 13.34.190(1)(a)(i) (allowing termination of parental rights when specific factors are established by clear, cogent, and convincing evidence). Termination and removal

23

must also be supported by an expert qualified to testify as to the prevailing social and cultural standards of the Indian child's tribe. 25 U.S.C. § 1912(e), (f); 25 C.F.R. § 23.122. Importantly, ICWA provides a heightened standard for removal during emergency proceedings, only allowing emergency removal and placement "in order to prevent imminent physical damage or harm to the child." *Compare* 25 U.S.C. § 1922, *with* RCW 13.34.065(5)(a)(ii)(B) (allowing emergency removal and placement when there is reasonable cause to believe that the release of the child to the parent would present a serious threat of substantial harm to the child).

When a court has a "reason to know" a child is or may be an Indian child, it must apply ICWA and WICWA standards. At the commencement of a child custody proceeding, the court is obligated to inquire from each participant whether there is a "reason to know" that the child is or may be an Indian child. 25 U.S.C. § 1912(a); RCW 13.38.070(1); 25 C.F.R. § 23.107(a).[14] The increased protections of ICWA apply "where the court knows or has reason to know that an Indian child is involved." 25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(b)(2). Similarly, the increased protections of WICWA apply when "the petitioning party or the court knows, or has reason to know, that the child is or may be an Indian child as defined in this chapter."

---

[14] The trial court in this case failed in its obligation to inquire from each participant whether there is "reason to know" the child is an Indian child at the commencement of the proceeding. The Court of Appeals noted this failure as well but held that the hearing substantially complied with the requirements of 25 C.F.R. § 23.107(a). *Z.J.G.*, 10 Wn. App. 2d at 457-60. The father did not appeal the substantial compliance issue.

RCW 13.38.070(1). An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); *see also* RCW 13.38.040(7) (substantially similar definition). If the court has "reason to know" the child is or may be an Indian child, the court must treat the child as an Indian child until it is determined on the record that the child does not meet the definition. 25 C.F.R. § 23.107(b)(2). The "reason to know" finding triggers the requirement that the petitioning party provide legal notice to the tribe, which then has the opportunity to intervene and determine the legal status of the Indian child. 25 U.S.C. § 1912(a); RCW 13.38.070. In this case, the application of ICWA and WICWA turns on whether there was a "reason to know" that Z.G. and M.G. are or may be Indian children.

### 1. *We Adopt a Broad Interpretation of "Reason To Know"*

We hold that a court has a "reason to know" that a child is an Indian child when any participant in the proceeding indicates that the child has tribal heritage. We adopt this interpretation of the "reason to know" standard because it respects a tribe's exclusive role in determining membership, comports with the canon of construction for interpreting statutes that deal with issues affecting Native people and tribes, is supported by the statutory language and implementing regulations, and serves the underlying purposes of ICWA and WICWA. Further, tribal membership

25

eligibility varies widely from tribe to tribe, and tribes can, and do, change those requirements frequently. State courts cannot and should not attempt to determine tribal membership or eligibility. This is the province of each tribe, and we respect it.

First, our holding fully respects a tribe's sovereign role in determining its own membership. Determining tribal membership is under the exclusive jurisdiction of a tribe. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978). "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Id.* "The determination of whether a child is an Indian child turns on Tribal citizenship or eligibility for citizenship. . . . [T]hese determinations are ones that Tribes make in their sovereign capacity and [the rule] requires courts to defer to those determinations." ICWA Proceedings, 81 Fed. Reg. at 38,803. This is because tribes are "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo*, 436 U.S. at 55 (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L. Ed. 483 (1832)). As sovereign nations, tribes make their own substantive law on internal matters. *Id.* Tribal membership criteria, classifications of membership, and interpretation of membership laws are unique to each tribe and vary across tribal nations. *See* Tommy Miller, Comment, *Beyond Blood Quantum: The Legal and Political Implications of Expanding Tribal Enrollment*, 3 AM. INDIAN L.J. 323, 323

26

(Dec. 15, 2014) (describing a range of approaches to tribal citizenship, including lineal descent, matrilineal descent, and blood quantum), https://digitalcommons.law.seattleu.edu/ailj/vol3/iss1/8 [https://perma.cc/3FV6-VU9M]; *see also, e.g.*, *Crews*, 118 Wn.2d at 566 (noting the Choctaw Nation's contention that membership begins at birth for all lineal descendants of those whose names appear on the final rolls). Tribes are in the exclusive position to determine the membership of their own nations, and ICWA and WICWA recognize and respect the sovereign power of tribes to decide this highly internal matter. RCW 13.38.070(3)(a); 25 C.F.R. § 23.108(b).

> As the Department points out,
>
> the trigger for treating the child as an "Indian child" is the reason to know that the child is an Indian child . . . [which] is not based on the race of the child, but rather indications that the child and her parent(s) may have a political affiliation with a Tribe.

ICWA Proceedings, 81 Fed. Reg. at 38,806; *see* BUREAU OF INDIAN AFFAIRS, DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 10-11 (2016) ("ICWA does not apply simply based on a child or parent's Indian ancestry. Instead, there must be a political relationship to the Tribe.") https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf [https://perma.cc/GDN3-BXWT]. This is true. The final determination of whether a child is an Indian child is not based on heritage or race. It is determined by the political affiliation of the child with a tribe. However, as stated above, *the tribe has*

27

*the exclusive jurisdiction to determine that political affiliation.* People involved in child custody proceedings likely will not know tribal membership and eligibility rules; indeed, it is entirely possible that those who are tribal members themselves may not know. Tribal membership is unique to each tribe. We will not construe "reason to know" in a way that would require state agencies and parents to determine for themselves whether the child is a member or eligible for membership. To do so would undermine tribes' exclusive authority to determine membership and would undermine the protections of the act. Instead, the "reason to know" standard covers situations where tribal membership is in question but is a possibility due to tribal heritage, ancestry, or familial political affiliation. The final determination of whether the child is an Indian child must then be made by the tribe itself, after it has been formally notified of the proceeding. 25 U.S.C. § 1912(a); RCW 13.38.070(1), (3)(a); 25 C.F.R. § 23.108.

Second, finding a "reason to know" when a participant indicates a child has tribal heritage comports with the canons of construction applicable to statutes that deal with issues affecting Native people and tribes. The "'canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.'" *Blackfeet Tribe of Indians*, 471 U.S. at 766 (quoting *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985)). One canon is directly applicable in this case: "statutes are to be

28

construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.* (citing *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 174, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973); *Choate v. Trapp*, 224 U.S. 665, 675, 32 S. Ct. 565, 56 L. Ed. 941 (1912)). We are required to construe the "reason to know" standard liberally in favor of notice, and any doubt about the "reason to know" standard should be resolved in favor of tribes. When there is a possibility of political affiliation due to heritage, we interpret "reason to know" in favor of notice to tribes when tribal heritage is indicated.

Moreover, this more expansive understanding of "reason to know" is also supported by the statutory provisions and implementing regulations that promote the early and expansive application of ICWA and WICWA. Federal regulations promote "compliance with ICWA from the earliest stages of a child-welfare proceeding." ICWA Proceedings, 81 Fed. Reg. at 38,779. WICWA states that courts should apply its protections "as soon as practicable in order to serve the best interests of the Indian child and protect the interests of the child's tribe." *See* RCW 13.38.070(2). "Early compliance promotes the maintenance of Indian families, and the reunification of Indian children with their families whenever possible, and reduces the need for disruption in placements." ICWA Proceedings, 81 Fed. Reg. at 38,779. It also "conserves judicial resources by reducing the need for delays, duplication, and appeals." *Id.* A broad understanding of "reason to know" promotes the early

29

application of ICWA without causing harm to tribes, tribal families, and children. The early application of ICWA and WICWA—"which are designed to keep children, when possible, with their parents, family, or Tribal community—should benefit children regardless of whether it turns out that they are Indian children." *Id.* at 38,803.

Recently passed federal regulations list factors that indicate a "reason to know" that a child is an Indian child. 25 C.F.R. § 23.107(c). Upon conducting the required inquiry, a court has "reason to know" that an Indian child is involved when

> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
> (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
> (4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
> (5) The court is informed that the child is or has been a ward of a Tribal court; or
> (6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

*Id.* The BIA encourages courts to interpret these factors expansively. GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT, *supra*, at 11.

Under both ICWA and WICWA, an "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); *see also* RCW 13.38.040(7) (substantially similar definition). The Department argues, and the Court of Appeals found, that the combination of these provisions—the factors indicating a reason to know and the statutory Indian child definition—means that a court has "reason to know" *only* if there was evidence or testimony at the proceeding that the child or parent *is a member* of a tribe. Suppl. Br. of Dep't at 10; *Z.J.G.*, 10 Wn. App. 2d at 450. However, this narrow interpretation commits the error addressed above: it assumes state agencies or participants will know and properly interpret tribal membership and eligibility rules. This interpretation diminishes the tribe's exclusive role in determining membership and undermines the historical purpose of providing proper notification to tribes.

The purposes behind ICWA support a broad understanding of the "reason to know" standard. One animating principle behind the act is the recognition that "States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). The act was meant to prevent states from removing children based on stereotypical ideas, without respect for social and cultural

31

differences. Another underlying purpose of the act was to guarantee due process to tribes so they have the opportunity to protect their sovereign interests in a child custody proceeding. 25 U.S.C. § 1912(a); *see* 25 C.F.R. § 23.108(a)-(b) ("The Indian Tribe of which it is believed the child is a member . . . determines whether the child is a member of the Tribe . . . . The determination by a Tribe of whether a child is a member . . . is solely within the jurisdiction and authority of the Tribe.").

As discussed above, the history of abusive removals without notice to tribes and the historical failure of state courts to provide proper due process to Native families means that tribal members may not have knowledge of their political affiliation with a tribe. The BIA recognizes this reality in 25 C.F.R. § 23.111(e), where it anticipates and provides for the scenario when there is a reason to know the child is an Indian child, but the participants do not know which tribe or tribes the child has a political affiliation with. If the identity of "the Tribes in which the Indian child is a member or eligible for membership cannot be ascertained, but there is reason to know the child is an Indian child, notice of the child-custody proceeding must be sent to the appropriate Bureau of Indian Affairs Regional Director." 25 C.F.R. § 23.111(e). Even if the participants in a proceeding are unable to identify a specific tribe, the court may still have "reason to know" that a child is an Indian child, requiring notice to the regional BIA office. The BIA can then utilize its expertise and resources to identify which tribes may need notification. A broad

understanding of "reason to know" supports the act's underlying purposes of tribal notice, determination of membership by tribes, and keeping state courts out of that determination. 25 U.S.C. §§ 1901(5), 1912(a); 25 C.F.R. § 23.108(a)-(b).

While a broad interpretation serves the statute's purposes, a narrow interpretation would undermine the protection of Indian children and tribes. The "reason to know" finding triggers the requirement of formal notification to tribes. 25 U.S.C. § 1912(a); RCW 13.38.070(1). Without formal notification, tribes are likely unaware of the child custody proceedings. Lack of notice repeats the historical harms that predicated the passage of ICWA and WICWA: Indian children are more likely to be taken and then lost in the system, often adopted when legally free, primarily to non-Native homes; tribes are denied the opportunity to make membership determinations; and tribes are unable to intervene in the case or exercise jurisdiction. 25 U.S.C. § 1911. Further, the failure to timely apply ICWA may unnecessarily deny ICWA protection to Indian children and their families, which could lead to unnecessary delays, as the court and parties may need to redo certain processes in order to comply with ICWA standards. ICWA Proceedings, 81 Fed. Reg. at 38,802; *see also* 25 U.S.C. § 1914 (noting that any Indian child, parent, or tribe may petition any court to invalidate a child custody action "upon a showing that such action violated any provisions of sections 1911, 1912, and 1913 of this title"). As those who practice in the area of child welfare and dependency know, if a court determines

33

that ICWA and WICWA should have been applied from the beginning of a case and was not, key decisions may have to be revisited because the burden of proof is higher at threshold stages of dependency cases. [15]

Finally, our interpretation is consistent with the way other states interpret the "reason to know" standard. For example, in *In re N.D.*, 46 Cal. App. 5th 620, 622-24, 259 Cal. Rptr. 3d 826 (2020), a California court of appeals found that when a father and mother indicated that they both had Native heritage, but "did not know the tribes in which that heritage existed," the court had "reason to know" the children might be Indian children. The court found that the agency, at a minimum, was required to send notice to the BIA. *Id.* at 624. In North Carolina, a court of appeals found that a record indicating that the child's mother had "potential 'Cherokee' and 'Bear foot' Indian heritage was sufficient to put the trial court on notice and provided 'reason to know that an "Indian child" [was] involved.'" *In re A.P.*, 260 N.C. App. 540, 546, 818 S.E.2d 396 (2018) (quoting 25 U.S.C. § 1912(a)), *review denied*, 372 N.C. 296 (2019). The court reasoned that since the "Indian child" status of the juvenile can be decided only by the tribe itself, a suggestion that the child may be of Indian heritage is enough to invoke the notice requirements of ICWA. *Id.* at 544-46. Additionally, in Colorado, the court of appeals found that a trial court had "reason

---

[15] We note that tribal membership requirements may change during the pendency of a case, as tribes update and modify their membership ordinances. Nothing in ICWA or WICWA limits their application to the status of the parents and children at the beginning of the proceedings.

to know" a child was an Indian child when the grandfather indicated he was a member of a Choctaw tribe. *In re Interest of S.B.*, 2020 COA 5, ¶¶ 18-21, 459 P.3d 745, 748-49. The court reasoned that even though there was no indication of parent or child membership, the grandfather's indication that he was affiliated with a tribe was "'reason to know' the child may have Indian heritage." *Id.* at ¶ 21.

We interpret the "reason to know" standard consistent with these cases. Doing so comports with ICWA's policy of establishing "minimum Federal standards" that apply consistently throughout the states. 25 U.S.C. § 1902; *Holyfield*, 490 U.S. at 46 ("[A] statute under which different rules apply from time to time to the same child, simply as a result of his or her transport from one State to another, cannot be what Congress had in mind."). A court has "reason to know" a child is an Indian child when a participant in the proceeding indicates the child has tribal heritage.

### 2. *WICWA Provides an Equal and Alternative Basis for Reversal*

Although we conclude that the language and legislative purposes of both ICWA and WICWA require the finding that a court has "reason to know" a child is an Indian child when a participant in the proceeding indicates that the child has tribal heritage, we also conclude that WICWA alone necessitates the same result. WICWA's language and definitions require this reading. Thus, we hold that WICWA is an independent basis, regardless of ICWA, to find that a court has

35

"reason to know" a child is or may be an Indian child when a participant in the proceeding indicates that the child has tribal heritage.

The statutory protections of WICWA apply when a court has reason to know "the child is or *may be* an Indian child." RCW 13.38.070(1) (emphasis added). The language "may be" suggests that WICWA provides broad coverage of the "reason to know" standard. A court has a "reason to know" not just when there is an indication that the child *is* an Indian child but also when there is an indication that the child *may be* an Indian child. *Id.*

Under WICWA, an "Indian child" is defined as "an unmarried and unemancipated Indian person who is under eighteen years of age and is either: (a) A member of an Indian tribe; or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." RCW 13.38.040(7). WICWA goes on to define "member" and "membership" as "a determination by an Indian tribe that a person is a member *or eligible for membership* in that Indian tribe." RCW 13.38.040(12) (emphasis added). A determination of eligibility is an express determination of membership under WICWA. Reading RCW 13.38.070(1), RCW 13.38.040(7), and RCW 13.38.040(12) together, WICWA applies when a court has reason to know that a child may be eligible for membership in an Indian tribe. Thus, a court has "reason to know" the child is or *may be* an Indian child, when something less than eligibility or membership is mentioned during the proceeding. As discussed

above, tribal heritage can implicate the required political affiliation of eligibility or membership, so any indication of tribal heritage during a proceeding gives a court a "reason to know" that the child may be an Indian child. *See supra* pp. 25-28. We hold that under WICWA, a court has "reason to know" that a child is or may be an Indian child when a participant in the proceeding indicates that the child has tribal heritage.

*3.     The Trial Court Had "Reason To Know" M.G. and Z.G. Were*

*Indian Children under Both ICWA and WICWA*

In this case, the trial court had a clear "reason to know" that M.G. and Z.G. were Indian children. At least three participants in the proceeding indicated that the children had tribal heritage. The Department's own petition stated that there was a reason to know that M.G. and Z.G. were Indian children, noting that the "[m]other has Tlingit-Haida heritage and is eligible for membership with Klawock Cooperative Association. She is also identified as having Cherokee heritage on her paternal side. Father states he may have native heritage with Confederated Tribes of the Umatilla in Oregon." CP at 2. Social worker Summers incorporated the petition into his testimony. This testimony about the Department's investigation into the children's tribal heritage qualifies as a participant in the proceeding informing the court that it

has "discovered information indicating that the child is an Indian child." 25 C.F.R. § 23.107(c)(2).

Moreover, the mother and the father testified that the mother was eligible for membership in Tlingit & Haida and KCA, and that the children were eligible for membership. While testimony of eligibility is not necessary to establish a "reason to know," it *is sufficient* for a court to make such a finding. The court also had "reason to know" the children were Indian children due to the mother and father's testimony of their tribal heritage with the Cherokee tribes and the Confederated Tribes of the Umatilla Indian Reservation.

The trial court erred when it found there was no "reason to know" M.G. and Z.G. were Indian children and erred by applying the non-ICWA removal standard to the shelter care proceeding. CP at 12 (finding that "[t]he child is in need of shelter care because there is reasonable cause to believe . . . [t]he release of the child would present a serious threat of substantial harm to the child"). Instead, the court should have applied the heightened ICWA and WICWA standards, which require that continued emergency removal be necessary "to prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922; RCW 13.38.140(2).

With the correct "reason to know" finding, ICWA and WICWA standards should have applied to this case "until it [was] determined on the record that the child[ren did] not meet the definition of an 'Indian child.'" 25 C.F.R. § 23.107(b)(2).

The "reason to know" finding would have triggered the formal notification process. 25 U.S.C. § 1912(a); RCW 13.38.070(1). After receiving formal notification, the tribes themselves make that determination. 25 C.F.R. § 23.108(a), (b); *see also* RCW 13.38.070(3)(a).

The trial court had reason to know that M.G. and Z.G. were Indian children under both ICWA and WICWA because participants in the proceeding indicated that they had tribal heritage. Accordingly, we reverse.

## III. CONCLUSION

Decisions to remove children from the care of their parents are some of the most consequential decisions judicial officers make. When those decisions impact a Native American tribe, those decisions reach beyond the individual family, affecting the continuation of a culture. We recognize that our rulings addressing dependency cases have far-reaching effects on children, their parents, the out-of-home placements in which dependent children reside, and the manner in which courts and judicial officers manage these complex cases. But, as the United States Supreme Court stated recently, "[T]he magnitude of a legal wrong is no reason to perpetuate it." *McGirt v. Oklahoma*, __ U.S. __, 140 S. Ct. 2452, 2480, 207 L. Ed. 2d 985

(2020). We will not perpetuate an understanding of "reason to know" that undermines the purposes of ICWA.

We hold that a trial court has "reason to know" that a child is an Indian child when a participant in the proceeding indicates that the child has tribal heritage. A broad interpretation of "reason to know" is necessary to respect a tribe's exclusive role in determining membership, comport with the canon of construction for interpreting statutes that deal with issues affecting Native people and tribes, comply with the statutory language and implementing regulations, and serve the underlying purposes of ICWA and WICWA. We hold that here the trial court had "reason to know" Z.G. and M.G. were Indian children. Accordingly, we reverse the Court of Appeals and remand this case to the trial court for further proceedings in accordance with this opinion.

Montoya-Lewis, J

WE CONCUR:

Stephens, C.J.    González, J.

Johnson J.        Gordon McCloud, J.

Madsen, J.        Yu, J

Owens, J          Whitener J.

41