IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 38075-1-III |
| | ) | (consolidated with |
| D.B.C.K.-S.† | ) | No. 38076-9-III) |
| | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | UNPUBLISHED OPINION |
| | ) | |
| L.R.C.T.K.-S. | ) | |
| | ) | |

LAWRENCE-BERREY, J. — This appeal concerns the dependency proceedings of

Ms. K.'s Indian children, D.B.C.K.-S. and L.R.C.T.K.-S. In 2019, the trial court found

both children dependent due to Ms. K.'s chemical dependency, mental health issues, and

unstable housing. Ms. K. appealed and this court affirmed. Our Supreme Court reversed,

holding that the Department of Children, Youth, and Families (Department) failed to

engage in active efforts to prevent the breakup of the Indian family and remanded to

immediately return Ms. K.'s children unless doing so would subject them to substantial

and immediate danger or threat of such danger.

---

† To protect the privacy interests of the minor children and their mother, we use
their initials throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to
Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

On remand, the trial court found Ms. K. had a long-standing, chronic, and untreated substance abuse disorder that created a substantial and immediate danger or threat of such danger and accordingly did not return the children to her.

Ms. K. appeals, arguing the Department failed to meet the heightened standard on remand, and the trial court's findings are not supported by sufficient evidence. She notes the Department presented mostly the same allegations from the 2019 dependency trial. But the Department's reliance on that evidence was reasonable, given that Ms. K. continued to refuse all engagement with the Department, the Northern Arapaho Tribe (Tribe), the court-appointed special advocate (CASA), and service providers other than visitation. The new evidence presented by the Department comes from Ms. K.'s recent run-ins with law enforcement, her continued association with felons and known drug users, her text messages involving drugs, and visitation center notes. The Department acknowledged its need to make active efforts going forward, but in light of the remedy here—immediate return—it necessarily presented the evidence it had available at the time of the hearing.

Ms. K. argued, alternatively, if there was sufficient evidence she had an untreated substance abuse disorder, there was no causal connection between that disorder and a

substantial and immediate danger or threat of such danger to her children. We conclude there was sufficient evidence and affirm the trial court.

FACTS

In August 2018, the Department filed a dependency petition against Ms. K., who has three children.[1] Her two youngest children, D.B.C.K.-S. (D.) and L.R.C.T.K.-S. (L.), are enrolled members of the Tribe through their father. As such, they are subject to the federal Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington State Indian Child Welfare Act (WICWA), chapter 13.38 RCW. The Tribe intervened in January 2019.

In early 2019, after two days of trial, the court found D. and L. dependent as to Ms. K. The court found Ms. K.'s primary parenting deficiencies were a chemical dependency, mental health issues, and unstable housing. The court ordered Ms. K. to participate in a chemical dependency assessment, a hair follicle test, random urinalyses, a psychological evaluation and treatment, and to maintain contact with the Department. She was later ordered to participate in a domestic violence assessment and parenting education.

---

[1] Ms. K.'s oldest child, A.L.K., is not a subject of this appeal.

No. 38075-1-III; 38076-9-III
*Dependency of D.B.C.K.-S.*; *Dependency of L.R.C.T.K.-S.*

*Initial appeals*

In March 2019, Ms. K. appealed to this court, arguing the Department had not engaged in active efforts to prevent the breakup of her family as required by ICWA and WICWA. This court declined to review her claim under the invited error doctrine. *In re Dependency of A.L.K.*, No. 36621-9-III, slip op. at 8-9 (Wash. Ct. App. Mar. 31, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/366219_unp.pdf.

Our Supreme Court granted discretionary review, held that the invited error doctrine did not apply, and concluded the Department did *not* engage in active efforts. *In re Dependency of A.L.K.*, 196 Wn.2d 686, 697, 701, 478 P.3d 63 (2020). The court affirmed the dependency order, vacated the out-of-home placement, and remanded "for immediate return of these two children to their mother, unless the court finds that returning the children puts the children in 'substantial and immediate danger or threat of such danger.'" *Id.* at 690-91 (quoting 25 U.S.C. § 1920). The Supreme Court issued its mandate on January 12, 2021.

*Remand: January 2021 dispositional hearings*[2]

As directed, the trial court held a hearing to determine whether returning the children to Ms. K. would put them in substantial and immediate danger or threat of such

[2] The hearings occurred on January 14 and January 28, 2021.

4

danger.  The court heard testimony and reviewed declarations from the Department's

social worker, Breanne Reeves, the children's court-appointed special advocate, Jay

Brunner, tribal representative, Shelly Mbonu, and Ms. K.

*Breanne Reeves*[3]

Ms. Reeves was assigned to this case in August 2018.  Before the current

dependency, the Department had been involved with Ms. K. for substance abuse

treatment and to address an unstable living environment.  In 2017 and 2018, Ms. K.

allegedly left her children with an unsafe person who was known for weapons, drugs, and

prostitution.

Ms. Reeves testified that returning the children to Ms. K. would subject them to

substantial and immediate danger or the threat of such danger due to her significant

untreated chemical dependency, lack of parenting skills, mental health issues, and lack of

safe and stable housing.

Ms. Reeves summarized her concerns as follows:

Ms. [K.] continues to demonstrate that she cannot—cannot or will not
control her behavior and her behavior impacts the child's safety.  She has
significant untreated substance abuse issues that can be shown by her drug
charges from May of 2019 where she was riding in a vehicle with known

---

[3] These facts come from Ms. Reeves's January 2021 testimony and declaration
(CP at 517-25, filed January 12, 2021), on which the court explicitly relied in making its
ruling.

> felons and drug users. Meth and heroin were found in her possession and she has pending charges stemming from this incident. She was then again found in a vehicle in April of 2020 with felons and known drug users to law enforcement. She was then again found in possession of meth, heroin suboxones, as well as foils, a digital scale. And she's . . . shown that she's continuing to associate with known felons and drug users. And in relations with a bunch of unsafe individuals which pose a safety risk to her children. Ms. [K.]'s children are very young in age. They're very vulnerable and do not have the ability to protect themselves.

Report of Proceedings (Jan. 14 & 28, Feb. 24, 2021) (RP) at 116.

Ms. Reeves testified that children of heroin or methamphetamine users face safety risks including the parent's "poor judgment, confusion, irritability, inadequate supervision, inconsistent parenting, chaotic home life" as well the children's "accidental ingestion of drugs [and] safety risks with other individuals that are around the parents that are also using." RP at 19. She explained, "parents who are under the influence or using drugs associate with other known criminals and drug users and this creates a safety risk because . . . parents sometimes do not have the ability to judge dangers for their children." RP at 19. Methamphetamine users often have "odd schedules, staying up for hours and hours, sometimes days at a time and falling asleep at times where other individuals are going about their main daily lives." RP at 117. Parents who use methamphetamine spend time with others who use and sell and could expose their children to those individuals.

6

At visits, Ms. K.'s parenting "is chaotic, it is not consistent, she is unable to manage the children's behaviors, [and] she's not consistent in her discipline." RP at 21. Ms. Reeves observed two visits where Ms. K. attempted to discipline but did not follow through. In other visits, Ms. K.'s children "would run from her, taunt her to chase them," and that "Covid protocol was not being followed, masks were not being worn or encouraged to wear." RP at 111. The "inconsistency creates this power struggle between her and the children." RP at 111. Furthermore, Ms. K. was "chronically late to her visits" due to transportation issues, yet she denied the Department's efforts to assist her with those barriers. RP at 113.

Furthermore, Ms. Reeves noted that up until this date, Ms. K.'s address was unknown and she had a history of moving from home to home with unsafe individuals and in homes known for criminal and drug activity.

Ms. Reeves reviewed a police report from an incident between Ms. K. and Josh Saylor in October 2020. Ms. K. had a black eye and her belongings were inside of Mr. Saylor's motorhome. Mr. Saylor said he was helping her gather items for court when she began yelling at him. Ms. Reeves learned that Mr. Saylor was potentially Ms. K.'s significant other based on Mr. Saylor's statements and the fact that the responding officers offered domestic violence information to Ms. K. Mr. Saylor is currently

incarcerated for driving while intoxicated, intimidating a witness, and harassment or threats to kill.

*Shelly Mbonu*

Ms. Mbonu is the ICWA director for the Northern Arapaho Tribe. When she started this case, she met with Ms. Reeves and read the case notes and court documents. Ms. Mbonu had participated in the 2019 fact-finding hearings, review hearings, and meetings since the appeal. She had spoken to Ms. K. about the case but had not done any independent investigation or personally observed visitation.

Ms. Mbonu believed that returning Ms. K.'s children would expose them to potential substance abuse and unsafe conditions. The safety risks include "being cared for with others and being exposed to people who may be using substances and just being around that environment." RP at 30.

Ms. Mbonu also believed that returning the children to Ms. K. would subject them to substantial and immediate danger. She opined that Ms. K. had not made any effort to resolve continuing substance abuse and mental health issues, which is evidenced by the recent police reports. Furthermore, after reading Ms. Reeves's declarations, Ms. Mbonu thought Ms. K. "appears to lack control during the visits." RP at 31. She continued, "it doesn't seem like there has been any kind of effort to rectify the substance abuse or any

8

kind of parenting, helpful parenting skills that might help her with some of that chaotic environment that happens during visitation." RP at 32. Ms. Mbonu observed that if Ms. K. could not control her children in parking lots or other public spaces and potential substance abuse occurred, "that would only add to the chaos" and cause safety risks. RP at 33. Ms. Mbonu stated this concern exists for any parent with untreated substance abuse issues.

On redirect examination, Ms. Mbonu explained that "there's more" to her opinion than Ms. K.'s alleged drug use. RP at 39. She explained, "she has refused to engage in any type of services. That's concerning to me. The chronic homelessness almost it seems like, the chaoticness of living situations is also very concerning. The people that she is engaging with and could potentially be around the children is very concerning." RP at 39.

In two separate declarations from January 2021, Ms. Mbonu opined that custody with Ms. K. "would likely result in serious emotional and/or physical damage to the children at this time." CP at 1150; *accord* CP at 598.

### *Jay Brunner*

Mr. Brunner, the CASA, based his opinions on information from the Department, the caregivers, and visit notes—rather than direct interactions with Ms. K. His initial concerns stemmed from the "situation in which the children were found." RP at 36. He

found it difficult to understand why Ms. K. refused services; he believed it would "be in the best interest of the children to have a mother . . . be actively involved." RP at 37. He explained,

> My concern going forward is that if the children were placed back into . . . Ms. [K.]'s custody, that given the lack of our understanding of her substance abuse since there is no evidence on way or the other, the concern about interactions with law enforcement and concerns for me about the—the individuals with whom she might be interacting with wouldn't look like the type of individuals you would want young children to be around. And there's no evidence that I know of of a safe housing location, secure and safe housing which would be really important to know if the children are returned to Ms. [K.].

RP at 37.

Mr. Brunner was concerned that Ms. K. "has recently been arrested for possession of a controlled substance" and continued to affiliate with drug abusers. RP at 66. "An individual under the influence of controlled substance[s] could have a higher than normal likelihood of not caring appropriately or providing the needs of the children in the home." RP at 66. He believed those behaviors could lead to housing issues if the family resided in a rental, which would have a dramatic effect on the children's stability. Further, the children may be at risk of ingesting such substances.

Mr. Brunner attended visits at the beginning of the dependency but subsequently relied on visit notes due to COVID-19. He did not know where Ms. K. lived because she had made minimal contact with the Department.

*Ms. K.*

At the time of the hearing, Ms. K. resided in a recreational vehicle (RV) at her friend's mother's house. Ms. K. stated that if her children were returned to her that day, she would "go get a hotel room or something" or they could "stay in my RV with me." RP at 76. Ms. K. further stated that the RV was small and filled with toys, and they might need a hotel voucher or to ask someone from the church for help. Ms. K. found a two-bedroom home with a fenced yard to move into the following month. She said she would submit her new landlord's information and the written rental agreement to the court.

Ms. K.'s support system included a bishop at the Mormon Church who had offered emergency rent funds. She had attended two sessions with a personal mental health counselor. She also worked with the Salvation Army and Serve Wenatchee.

Ms. K. disputed that her visits were chaotic:

> I don't think that that's very fair to say about our visits around family because chaos is negative sounding to me. And I think our visits are exciting. I think my kids are happy and they just love life and they are so happy to see each other. And they are runners. They are runners. And they just do so good—they do so good. They listen, they don't listen. You know, that's the way it goes. [E]verybody is learning. . . .

11

RP at 81. She had attended "about 99%" of visits and had asked Ms. Reeves to attend so she could "see us all together." RP at 81. Ms. Reeves attended one visit over Zoom. Ms. K. continued, "I think I do good at visits. I got three kids and they all want my attention and they're just so excited about life and that's just awesome." RP at 82.

When asked what she wanted the outcome of the hearing to be, Ms. K. replied:

I don't think the Department deserves a chance to provide active efforts to me. I don't think that the Tribe has done their part to protect their tribe members. I don't think they deserve a chance. . . . I have not communicated too much with anybody but I sure have made a lot of requests for things to happen and for documents to be made correct and— and get ignored. I don't get response really (indiscernible) changed and there's been big deals in this whole situation and I'm not okay. . . .

RP at 82-83.

Ms. K. concluded:

I would like the Court to order the children to be returned with no strings attached, meaning with no involvement with the Department or the Tribe. Not saying in the future but as of right now I think that this case needs to be closed. I think that I would like housing funds so it will cover this new place that we're moving into. It's gonna happen, you know, and I need some financial support. . . . I would like housing assistance or an order to receive housing funds.

RP at 86-87.

On cross-examination, the Department brought up substance abuse:

12

[THE DEPARTMENT:]  Okay. Now, you're aware that the Department's concern up until this point has largely been substance use. You're aware of that, right?

[MS. K.:]  Yes.

[THE DEPARTMENT:]  And would you agree that—was actively using controlled substances such as heroin or methamphetamine would not be a safe parent.  Would you agree with that proposition?

[MS. K.:]  I'm not quite sure.  Can you ask the question again please?

[THE DEPARTMENT:]  Sure.  Do you have an opinion regarding whether a parent who is actively using heroin or methamphetamine or that type of drug, whether they would be a safe parent?

[MS. K.:]  I—I am not sure.  I can only answer for myself that I don't do drugs with my children.  I stopped that a long time ago.

. . . .

[THE DEPARTMENT:]  Would you agree that if the Court were to find that you were actively using controlled substances, such as heroin or methamphetamine that it would not be safe to place [the children] with you? Would you at least agree with that?

[MS. K.'S COUNSEL:]  I would object.  That calls for speculation.

THE COURT:  Overruled. Go ahead.

[MS. K.]:  I don't—my children would not be harm [sic] with being placed with me.

RP at 90-91.

Ms. K. verified her history of drug use and related criminal convictions.  She said she last used drugs in 2014, but later admitted to undergoing inpatient treatment in 2017. When asked again if she used after 2014, she answered, "Well, I—I—I'm not—I don't know.  I'm not sure."  RP at 94.  She agreed that she previously testified to not using in 2018 or 2019 and stated she was not currently using.

13

Ms. K. confirmed that she had refused all drug testing and treatment since the

beginning of the case. She understood the court was watching to see if she was actively

using before making a placement determination. When asked why she would not show

she was sober, she answered:

> I've been held down by this Department 19 times already before. I've
> worked with this closely. They've been stalking the visits without notifying
> me first. I've worked closely with this Department and I've got no findings
> found ever. I beat a dependency case in 2016 . . . . I think that I take care
> of my kids and drugs are not in—in the issue. They're not in the picture.

RP at 95-96.

Ms. K. invoked her Fifth Amendment to the United States Constitution right not to

testify about the traffic stops and subsequent drug-related charges that were then pending.

She also said she did not know Josh Saylor, and she did not have a black eye in October.

*Court's oral ruling*

After the parties presented closing arguments, the court ruled from the bench:

> This case began 2 and ½ years ago. The . . . concerns raised by the
> Department appear to this Court to have been mainly chronic and untreated
> chemical dependency issues. It does appear that . . . spills into other areas
> of parental deficits and that would include mental health issues. The
> housing issue as well but only in conjunction to this notion that Ms. [K.]
> was, I'll call it bouncing around. There was a lack of . . . stability in her
> housing, which in and of itself isn't necessarily a problem except that
> there's a long history with Ms. [K.] of changing residences, living in
> hotels, exposing the children to people and situations that create risks and
> dangers. . . .

14

And so, this Court finds that all of those concerns are well founded. The Court does find that Ms. [K.] has a chronic and longstanding and untreated chemical dependency problem and it has spilled into mental health issues and it has created dangers and risks for the children with the lack of suitable housing and the moving around and exposing the children to unsafe situations. . . .

. . . .

This Court finds there's been no substance abuse assessment, no UAs [urinalyses], no hair follicle [test], no psycho[logical] eval[uation], no—no mental health evaluation or assessment of any kind. . . .

The . . . charges now pending for possession of a controlled substance with the intent to distribute is [sic] especially concerning. . . . [T]his association with known felons and drug users . . . increases the risk that these children would be exposed to dangerous things . . . whether it's meth, whether it's heroin, whether it's taking prescription medications that might be in the possession of mom or one of the folks who she's associating with. There are things like needles and other substances that the children can be around, all of which the children can be exposed to whether— whether it's mom's drug use or whether it's other folks she's associating with.

So, the Court has given this matter great consideration and does find that returning the children to mom's home would—would in fact subject them to a substantial and immediate danger or threat of such danger, as that issue was framed by the . . . Supreme Court. . . .

RP at 137-40.

*Order of disposition*

On February 24, 2021, the court entered the order of disposition in the dependency

underlying this appeal. Before entering the order, the court addressed Ms. K.:

THE COURT: . . . I just want to make sure that you understand the Court is receiving information that you're choosing to engage in visits, but that's it or virtually it. I know there was testimony at the last hearing about

15

refusing to engage in any services. And I want to make sure you understand the seriousness of that decision.

. . . And I want to make sure it's real clear to you on the record that you understand that your outright refusal to participate in any services . . . is not going to end well. Do you understand what the implications of that will be?

[Ms. K.]: I—is not going to end well. . . . I have been in contact with . . . a family preservation person . . . and things like that and I'm not refusing the services, but . . . . I'm not refusing services, but . . . I'm not gonna work with this Department, pretty much here, so.

THE COURT: All right.

[Ms. K.]: Thank you.

THE COURT: . . . [W]hen I say not end well, what I'm referring to is the goal of these—of this process is reunification of the family. And with the perspective towards that goal, things are not gonna end well if there's going to be a refusal, in your words, to participate in the services. . . .

RP at 152-53.

The order of disposition reads, in relevant part:

2.2 [X] The facts establish by clear cogent and convincing evidence that returning the child to the child's mother would subject the child to substantial and immediate danger or threat of such danger as contemplated by 25 U.S.C. § 1920 and RCW 13.38.160.

. . . .

2.2.5 The court finds that Ms. [K.] currently has a longstanding, chronic and untreated substance abuse issue, largely stemming from methamphetamine use . . . .

2.2.6 On April 12, 2020, . . . [a] purse that Ms. [K.] had possession of . . . contained drug paraphernalia, heroin, methamphetamine, [and] suboxone . . . . The two other occupants of the vehicle were known felons and drug users . . . .

2.2.7 On May 28, 2019, Ms. [K.] was . . . searched by law enforcement. Ms. [K.]'s purse contained . . . methamphetamine and . . . suspected [ ] black tar heroin. . . . Of the two other individuals in the

16

vehicle, one was under the supervision . . . and the other one had an active warrant for his arrest. . . .

. . . .

2.2.9   In December 2020, the Department received two screenshots of text messages between Ms. [K.] and another individual where the topic involved obtaining controlled substances.  This court finds that these text messages are further evidence of Ms. [K.]'s current substance abuse and her continued association with individuals who are also actively using non-prescribed controlled substances.

2.2.10 Ms. [K.]'s longstanding, chronic and current chemical dependency creates a substantial and immediate danger or threat of such danger.

2.2.11 . . .  [M]ethamphetamine and heroin can cause severe harm and possibly death if ingested by one of her children.  The age of the children make[s] them particularly susceptible to this risk . . . .

2.2.12 Ms. [K.]'s substance abuse contributes to her homelessness and has contributed to her history of placing her children in danger by allowing the children to reside in homes where significant substance abuse activity occurs and known criminals, drug users and others who pose a substantial and immediate danger or threat of such danger to these children reside.

2.2.13 Ms. [K.] continues to associate with individuals who use drugs and have criminal histories that pose a risk to these children. . . . The court finds that because of the mother's untreated substance abuse, [she] will likely continue to associate and expose her children to these individuals and the risks they pose. . . . Mother's substance abuse interferes with her ability to appreciate, recognize, and anticipate these threats to her children and then make safe decisions related to preventing unsafe individuals' [sic] access to her children. . . .

2.2.14 Ms. [K.] has a history of not being present to attend to her children's needs at times due to her substance abuse. . . .  The court finds that the mother's current substance abuse issues create a substantial and immediate danger or risk of danger to her children by making her unavailable to meet the basic day to day needs of her children.

2.2.15 Since the current Dependency, Ms. [K.] has not engaged in any service offered by the Department such that this court could

17

find that any of Ms. [K.]'s parental deficiencies have been mitigated in any meaningful fashion. Ms. [K.] has not participated in substance abuse treatment, urinalysis testing, a psychological evaluation, mental health treatment, or . . . shown proof of safe and stable housing.

    2.2.16 Ms. [K.]'s chaotic and disorganized parenting style . . . increases the substantial and immediate danger or risk of danger to Ms. [K.]'s children caused by her controlled substance use. Ms. [K.]'s visits have been marked by chronic tardiness . . ., the children exhibiting challenging behaviors . . ., and Ms. [K.]'s inability to follow through with discipline to correct the behaviors. In August 2019, Ms. [K.]'s visits were reduced . . . due to the chaotic nature of the visits and the emotional distress to the children. This court finds that the children are at [a] substantial and immediate danger or risk of danger of the same emotional harm due to the mother's lack of parenting skills, especially when combined with her chronic substance abuse issues.

Clerk's Papers (CP) at 1281-83.

The order also indicated, "[T]he court finds by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger." CP at 1283.

The court ordered Ms. K. to engage in drug and alcohol evaluations, treatment and testing, parenting education, a psychological evaluation, a mental health assessment, hair follicle testing, and to maintain contact with the Department.

Ms. K. timely appealed to this court.

ANALYSIS

SUBSTANTIAL AND IMMEDIATE DANGER

Ms. K. contends the trial court erred in finding that returning her children would subject them to substantial and immediate danger or threat of such danger. We disagree.

*Standard of review*

In general, we review a juvenile court's findings of fact in a dependency proceeding for substantial evidence. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871, 439 P.3d 694 (2019). Substantial evidence is that which, when viewed in the light most favorable to the prevailing party, a rational trier of fact could find by a preponderance of the evidence. *Id.* We review de novo whether the juvenile court's findings of fact support its conclusions of law. *Id.*

*ICWA and WICWA*

In proceedings involving children subject to ICWA and WICWA, the Department is held to a "heightened standard." *A.L.K.*, 196 Wn.2d at 697. That is so because "'ICWA and WICWA were enacted to remedy the historical and persistent state-sponsored destruction of Native families and communities.'" *Id.* (quoting *In re Dependency of Z.J.G.*, 196 Wn.2d 152, 157, 471 P.3d 853 (2020)). As such, the statutes impose more exacting requirements on the Department, including that the Department

19

engage in "'active efforts . . . to prevent the breakup of the Indian family.'" *Id.* (quoting

25 U.S.C. § 1912(d)). Both federal and state law require the Department to "*affirmatively*

*assist the parent*" in an effort to maintain or reunite the child with the family, even where

the parent resists engaging in services. *Id.* at 699; 25 C.F.R. § 23.2; RCW

13.38.040(1)(a).

In this case, the Supreme Court determined the Department did not engage in

active efforts up until the 2019 hearings. *A.L.K.*, 196 Wn.2d at 690. It ordered the

statutorily prescribed remedy: to immediately return the children to Ms. K. unless doing

so would subject them to a substantial and immediate danger or threat of such danger.

*Id.* at 703-04 (quoting 25 U.S.C. § 1920); RCW 13.38.160.

On remand, the trial court concluded that there was clear, cogent and convincing

evidence that returning Ms. K.'s children would subject them to a substantial and

immediate danger or threat of such danger. Clear, cogent, and convincing evidence exists

when the evidence shows that the ultimate fact in issue is highly probable. *In re

Dependency of A.M.M.*, 182 Wn. App. 776, 785, 332 P.3d 500 (2014). On review, we

must consider whether substantial evidence supports the trial court's determination in

light of this heightened, "highly probable" standard. *Id.*

We first address Ms. K.'s argument that, on remand, the Department presented mostly stale allegations from the 2019 dependency trial. There is little new evidence from which to evaluate Ms. K. because she had continued to refuse all engagement with the Department, the Tribe, the CASA, and service providers other than visitation. What recent evidence the Department had came from Ms. K.'s run-ins with law enforcement, her continued association with felons and drug users, text messages involving drugs, and visitation center notes. The Department acknowledged its obligation to make active efforts going forward, but in light of the remedy here—immediate return—it necessarily conducted the hearing on available evidence.

We next address Ms. K.'s related argument that her past behaviors were not relevant to the trial court's 2021 inquiry. This position is contrary to long-standing and well-established precedent. *In re Dependency of J.C.*, 130 Wn.2d 418, 427-28, 924 P.2d 21 (1996) (explaining that Washington courts recognize past history as a factor in weighing parental fitness). A trial court has wide discretion in evaluating risk of harm; we do not require "proof of actual harm, only a 'danger' of harm." *In re Dependency of Schermer*, 161 Wn.2d 927, 951, 169 P.3d 452 (2007). Ms. K. points to no case law against the proposition that danger of harm may stem from past patterns or circumstances that influenced the children.

In *In re Dependency of Brown*, 149 Wn.2d 836, 842, 72 P.3d 757 (2003), a child was found dependent due to a parent's substance abuse, lack of parenting skills, and unstable home. The father argued the trial court erred in looking solely to past conduct when considering his parental fitness. *Id.* at 841. He made efforts to alleviate those problems, including securing a job and housing, but our Supreme Court affirmed the trial court's determination that he "had yet to show he could provide a stable home that posed no danger of substantial damage to the child's physical or psychological health." *Id.* at 842. The court required the father "to establish some degree of stability, which he had yet to do." *Id.* The record shows significant instability in Ms. K.'s past, and she demonstrated less effort to alleviate those problems than the parent in *Brown*.

Accordingly, we reject Ms. K.'s argument that her behavior throughout her children's lives was somehow not relevant to the trial court's substantial and immediate danger inquiry. The court may consider how her past behavior contributed to her parental fitness and could subject her children to substantial and immediate danger if returned.

Ms. K. next contends the trial court failed to abide by the directives of our Supreme Court and violated the law of the case doctrine. She argues *A.L.K.*, 196 Wn.2d 686, must be followed in all subsequent stages of litigation. She contends that because the Department's 2019 allegations fell short and they are largely the same now, the trial

court erred in not returning her children. We disagree with her application of the law of the case doctrine.

"Once an appellate court issues its mandate, the court's decision becomes 'effective and binding on the parties to the review and governs all subsequent proceedings in the action in any court.'" *State v. Strauss*, 93 Wn. App. 691, 697, 969 P.2d 529 (1999) (quoting RAP 12.2). In other words, the holding of the appellate court "must be followed in all of the subsequent stages of the same litigation." *State v. Schwab*, 163 Wn.2d 664, 672, 185 P.3d 1151 (2008); *see also Bank of Am., NA v. Owens*, 177 Wn. App. 181, 190, 311 P.3d 594 (2013) ("The law of the case doctrine binds the parties, the trial court, and subsequent appellate courts to the holdings of an appellate court in a prior appeal until such holdings are authoritatively overruled.").

Here, we are bound by the holding that the Department failed to engage in active efforts up until the 2019 dependency trial. The mandate directed the trial court to return the children unless it found that doing so would subject them to substantial and immediate danger. As such, the purpose of the January 2021 hearings was to return the children absent that finding and the majority of the testimony related to that question. The trial court did not violate the law of the case doctrine as its ruling did not run afoul of the Supreme Court's holding about active efforts. The trial court explicitly made its ruling

pursuant to the Supreme Court's mandate.

We now turn to Ms. K.'s arguments, which challenge the trial court's findings.

*Long-standing, chronic, and untreated substance abuse*

Ms. K. argues the trial court's findings as to her substance use are not supported by substantial evidence in the record. We disagree.

The trial court found that Ms. K. currently has a "longstanding, chronic and untreated substance abuse issue." CP at 1282 (Finding of Fact (FF) 2.2.5). This finding was supported by Ms. K.'s two most recent encounters with law enforcement, the drug-seeking text message, and her history of drug-related behavior, convictions, relapses, and refusal to seek treatment.

The "long-standing" aspect of the finding is evidenced by Ms. K.'s 2006, 2008, and 2012 felony convictions for possession of methamphetamine, her relapse in 2017, RP (Jan. 28, 2019) at 91; RP (Jan. 31, 2019) at 18-19, and reports that she smoked in the bathroom when her children were home and left drugs or paraphernalia in her living spaces. *See, e.g.*, CP at 523 (oldest daughter described pipe Ms. K. smoked from); CP at 519-20 (needle caps found in hotel room Ms. K. vacated); RP (Jan. 31, 2019) at 200-03 (bag of methamphetamine found in bathroom used by Ms. K. and her children). We acknowledge that this evidence is several years old. But the question is whether her drug

abuse was "long-standing." "Long-standing" means "having existed for a long time."

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1334 (1993). This necessarily

requires consideration of Ms. K.'s past.

The "chronic" aspect of this finding is evidenced by numerous instances of drug

possession and potential use throughout the dependency proceedings. "Chronic" means

"marked by a long duration, by frequent recurrence over a long time" and "given to

steady or frequently repeated behaving or acting : given to being habitually."

WEBSTER'S, *supra*, at 402.

In May 2019 and April 2020, police officers found drug paraphernalia, heroin,

methamphetamine, and other controlled substances in Ms. K.'s purse. CP at 1282

(FF 2.2.6, 2.2.7). The police reports for both incidents are in our record. *See* CP at 540-

49 (May 2019 incident); CP at 531-39 (April 2020 incident); CP at 526 (probable cause

statement to charge Ms. K. with possession after April 2020 incident). And, in December

2020, Ms. K.'s text messages show a sender asking if Ms. K. had "anything" and that they

would "take a pt for all that stuff." CP at 551. Ms. K. replied, "If U don't tell ME wut U

need n get 2 tha point" and later, "I have nuthin I am burnt broke . . . ." CP at 551. This

discussion shows the sender asked Ms. K. for drugs, to which she replied to be more

specific, and that she had no drugs because she was "burnt broke." If she no longer used

drugs, she could and probably would have said as much. This is evidence that Ms. K. associated with drug users and permits an inference that she was still using drugs as well. Three documented instances of drug discussion and possession within 18 months of a dependency, along with the evidence supporting the "long-standing" finding detailed above, are sufficient evidence that Ms. K.'s substance abuse was marked by a long duration and was steadily or frequently repeated.

The "untreated" aspect of this finding is not contested. The court found Ms. K. refused to engage in substance abuse treatment or testing. Ms. K. does not dispute this; indeed, she admitted as much. However, she argues that the court cannot prove substance use through her nonparticipation in drug testing. But the fact that she refused to engage in services shows that the disorder (or alleged disorder) is *untreated*. Thus, that aspect of the finding is supported by the record.

Ms. K. argues there is no "substantive evidence" of drug abuse. Br. of Appellant at 13. To the extent she means there is no direct evidence of such use, outside of her self-serving testimony on her sobriety, she is correct. The evidence is all circumstantial because Ms. K. refused to engage in testing and avoided all contact with the Department. But it is well established that circumstantial evidence is not any less reliable or probative than direct evidence. *State v. Sprague*, 16 Wn. App. 2d 213, 233, 480 P.3d 471 (2021).

Furthermore, as numerous trial judges throughout this case have noted, Ms. K. could have provided (more reliable) direct evidence of her sobriety by undergoing court-ordered testing. But she has not done so, and it is not our role to weigh conflicting evidence. We conclude that the evidence in the record is sufficient to persuade a rational, fair-minded person that Ms. K. has a long-standing, chronic, and untreated substance abuse problem.

*Causal connection*

Ms. K. next contends that even if the evidence supports a finding of untreated substance abuse, there is no causal connection between the alleged substance abuse and her parenting deficiencies. Again, we disagree.

To support continued foster care placement or termination of parental rights, the State must present evidence of a causal connection between the particular conditions of the home and the likelihood that continued custody will result in serious emotional or physical damage to the child. 25 C.F.R. § 23.121(c). The existence of poverty, drug abuse, and inadequate housing does not *by itself* constitute clear and convincing evidence that return to the parent would result in serious emotional or physical damage. 25 C.F.R. § 23.121(d); *In re Dependency of G.J.A.*, 197 Wn.2d 868, 904, 489 P.3d 631 (2021).

Here, the record firmly supports a finding that Ms. K.'s untreated substance abuse contributed to circumstances that created a substantial and immediate danger or threat of such danger to her children.

First, drugs can severely harm young children if ingested, and paraphernalia such as glass pipes and needles can cause injury. Ms. K. had been found with methamphetamine, heroin, needles, and other paraphernalia—in her purse and living spaces—numerous times since the proceedings began. Testimony established that these substances posed a great risk to children of D. and L.'s ages who were "extremely vulnerable" given the possibility of accidental ingestion. CP at 519. Ms. K.'s continued possession of controlled substances continued to create the risk identified earlier in the proceedings.

Second, Ms. K.'s drug use created a risk that her children would be exposed to individuals who use and sell drugs. Methamphetamine users are often "unpredictable in their mental and emotional stability" as well as "often angry and irrational." RP at 117. Ms. K. had historically exposed her children to such individuals and interacted with them herself. During Ms. K.'s 2017 relapse, she left her children with dangerous individuals. Her two recent encounters with law enforcement show she continued associating with drug users and, in October 2020, she was found with Mr. Saylor, who has since been

incarcerated for violent crimes. In December 2020, Ms. K. texted a drug user. This behavior demonstrated that she had not distanced herself from either drug users and/or unsafe individuals.

Third, substance abuse can impact a person's reasoning, judgment, consistency, and ability to supervise young children. Ms. K. was chronically tardy—she was late to over 70 percent of visits through December 2020 and missed 24 altogether. CP at 521; *see also* CP at 555, 561, 564, 567, 585 (visit notes indicating tardiness). Several supervisors noted that Ms. K. had great difficulty managing her children and failed to set and maintain disciplinary rules. *See* CP at 556, 559, 562, 565, 568, 571, 574 (visit notes indicating Ms. K.'s inability to control children). Indeed, two visitation centers had terminated services because Ms. K.'s visits required two supervisors and the visits were "chaotic and crazy." CP at 580. In December 2020, Ms. K. got into an altercation with the visitation supervisor, began recording on her cell phone without permission, and threatened to call her lawyer before leaving without saying goodbye to her children. She was then seen hiding behind a house next to the facility. CP at 586, 589 (visit notes); CP at 591 (unusual incident report). This strange episode supports a finding that Ms. K.'s reasoning and judgment may be impaired, and the majority of visit notes reflected her inability to supervise her children, even in a controlled environment. This lack of control

and discipline created a substantial and immediate danger or threat of such danger for Ms. K.'s young children.

Finally, Ms. K.'s substance abuse contributed to unstable housing and potential homelessness that placed her children at risk of substantial and immediate danger. The record indicated that Ms. K. had been evicted more than once since the beginning of this dependency. Ms. K. testified that she was currently staying in an RV at a friend's house. The RV was not hers. She noted the RV was filled with stuff and there was no space, but she could "get a hotel room or something" if she had financial assistance. RP at 76. She claimed to have secured a two-bedroom house for her family but never submitted follow-up information to the trial court. She later asked for housing assistance. Even if she had secured temporary housing—which the record does not reflect—that does not negate the fact that her children have experienced housing instability each time they have been in her care and some of that instability is a result of drug use. Unstable housing placed the children at risk. Ms. Reeves, Ms. Mbonu, and Mr. Brunner all testified to this fact. There was no evidence showing Ms. K. had secured stable housing for the children or herself.

The trial court's conclusion that there is clear, cogent, and convincing evidence that returning Ms. K.'s children would subject them to substantial and immediate danger or threat of such danger is supported by substantial evidence.

IN-HOME DEPENDENCY

Ms. K. argues the trial court erred in rejecting her request for an in-home

dependency and finding that a manifest danger of serious abuse or neglect existed if the

children were returned home.  We disagree.

A trial court may order out-of-home placement for an Indian child only if

reasonable efforts have been made to prevent or eliminate the need for removal and

services have been offered yet failed to prevent the need for out-of-home placement,

unless the child's health, safety, and welfare cannot be protected adequately in the home,

and

> (a)  There is no parent or guardian available to care for such child;
> (b)  The parent, guardian, or legal custodian is not willing to take custody of the child; or
> (c)  The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

Former RCW 13.34.130(5) (2018).

As noted previously, the trial court did not err when it found there was clear,

cogent, and convincing evidence that returning the children to Ms. K would subject

them to substantial and immediate danger or threat of such danger.  There is no

meaningful distinction between this finding and the finding required under former

31

No. 38075-1-III; 38076-9-III
*Dependency of D.B.C.K.-S.; Dependency of L.R.C.T.K.-S.*

RCW 13.34.130(5)(c) for out-of-home placement. Both require clear, cogent, and convincing evidence. And the slight difference in the substantive standards—"substantial and immediate danger or threat of such danger" versus "manifest danger [of] serious abuse or neglect"—is inconsequential. Denying Ms. K.'s request for an in-home dependency was, practically speaking, the same as denying return of her children. We conclude the trial court did not err in denying Ms. K's request for an in-home dependency.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.

Fearing, J.

32