**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of<br><br>C.M.L. and C.S.S.,<br><br><br>Minor children. | No. 84852-6-I<br>(consolidated with Nos.<br>84853-4-I, 85000-8-I, 85001-6-I)<br><br>ORDER GRANTING MOTION TO PUBLISH |

Respondent the Department of Children, Youth, and Families filed a

motion to publish the opinion filed on August 28, 2023 in this case, and appellant

filed an answer to the motion.  A majority of the panel has determined that the

motion should be granted.  Now, therefore, it is hereby

ORDERED that respondent's motion to publish the opinion is granted.

FOR THE COURT:

Judge

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of<br><br>C.M.L. and C.S.S.,<br><br><br>———————————— Minor children. | No. 84852-6-I<br>(consolidated with Nos.<br>84853-4-I, 85000-8-I, 85001-6-I)<br><br>UNPUBLISHED OPINION |

BOWMAN, J. — D.L. appeals the trial court's denial of her motion to vacate a default order terminating her parental rights to C.M.L. and C.S.S. D.L. argues we should set aside the default order because (1) the Department of Children, Youth, and Families (Department) failed to notify her of the motion for default under CR 55(a)(3), (2) the Department deprived her of due process because the termination summons did not adequately advise her of her right to an attorney, and (3) the factors under CR 60(b)(1) supported vacating the default judgment. We affirm.

FACTS

D.L. is the biological mother of C.M.L. and C.S.S. The children's biological father is deceased. In May 2021, the Department filed dependency petitions and removed both children from D.L.'s care, citing D.L.'s issues with mental health, substance use, and parenting skills. The court appointed D.L. an attorney, and

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/2

the Department assigned her a caseworker to assist D.L. with reunification services.

In June 2021, the Department referred D.L. for a drug and alcohol evaluation, but she did not follow through with the assessment. And between May and August 2021, the Department referred D.L. for drug testing, but she failed to appear to submit samples.

On September 16, 2021, the court issued an order finding the children dependent. Then, in November 2021, D.L. completed detox and a drug and alcohol evaluation. In December 2021, she completed a 28-day inpatient treatment program. After inpatient treatment, D.L. began an intensive outpatient treatment program. But in January 2022, she relapsed and stopped participating in treatment.[1] In June 2022, D.L. started another 28-day inpatient program, but she again stopped outpatient treatment after discharge.

The Department also referred D.L. for mental health and family preservation services throughout 2021, but she did not participate in any of the services. And she did not regularly visit her children or maintain regular contact with her caseworker.

On August 24, 2022, the Department filed petitions to terminate D.L.'s parental rights to C.M.L. and C.S.S. The petitions noted that the father may have been a member of the Turtle Mountain Band of Chippewa Indians. So, the Department sent notice to the tribe as required by the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901, and the Washington State Indian Child Welfare

---

[1] When D.L. stopped outpatient treatment, she lost her housing.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Act (WICWA), chapter 13.38 RCW.  The tribe responded that neither the children

nor the father were members and that the children were not eligible for membership.

On October 28, 2022, D.L.'s Department caseworker Stacie Naweli personally served D.L. with the termination petitions and a "Notice and Summons/Order [re] Termination of Parent-Child Relationship." The summons informed D.L. that the Department was seeking to terminate her parental rights to C.M.L. and C.S.S. It said that the court scheduled a preliminary hearing on termination for December 5, 2022 at 9:00 a.m.[2] The notice informed D.L. that she "should be present at this hearing." And it warned her that if she did not appear, "***the court may enter an order in*** [***her***] ***absence*** . . . [p]ermanently terminating [her] parental rights."[34] The notice also informed D.L. that she had the right to an attorney and instructed her how to request one.

When Naweli gave D.L. the summons, she "pointed out the date of the hearing." Naweli also told D.L. that "she could appear at the hearing via Zoom[5] and then asked [D.L.] for a good e[-]mail address," which D.L. provided.

On November 1, 2022, Naweli e-mailed D.L. a service letter that included the preliminary termination hearing date and time and information on how to access the hearing. And on November 30, 2022, Naweli e-mailed D.L. the

---

[2] Under Snohomish County Superior Court Local Juvenile Court Rule (SCLJuCR)
[3] .6A(a), "[i]n every matter set for a dependency, guardianship, or termination fact-finding hearing, a preliminary hearing shall first be had to resolve all undisputed facts and to consider matters of law."

[4] "Any party not appearing at the preliminary hearing in person or by counsel, after proper notice, may be adjudged in default." SCLJuCR 3.6A(c).

[5] Zoom is an online platform that provides audio and video conferencing.

preliminary hearing date and time, the Zoom link to appear at the hearing, and the call-in information.[6] She also called D.L.'s last known phone number[7] and left a voice mail asking for a return call. Naweli then texted D.L. that she had emailed her the Zoom link to appear at the hearing.

D.L. did not appear at the preliminary hearing on December 5, 2022.[8] So, the Department requested to proceed by default, which the court allowed. The Department first asked the court to find that ICWA and WICWA do not apply based on the tribe's determination that neither child is a member or eligible for membership. The trial court found that ICWA and WICWA do not apply.

The Department then presented testimony from caseworker Naweli. Naweli described the services the Department offered D.L. and D.L.'s lack of compliance with those services. Naweli opined that there is "little likelihood that the children can be returned to [D.L.] in the near future" because she "has not engaged in services necessary to remedy her parental deficiencies" or "maintained contact" with the children or the Department. She also stated that D.L. was unfit to parent the children because of her ongoing substance use,

---

[6] Naweli sent both the November 1 and November 30 e-mails to the address that D.L. provided on October 28, 2022, to another e-mail address that D.L. had "personally provided" on December 16, 2021, and to two other addresses "that had been provided from parent locator searches."

[7] Naweli called the phone number "that she had been using to communicate with" D.L. since October 2022 and "had no reason to believe . . . was not a good number to reach [D.L.]."

[8] D.L.'s dependency attorney appeared at the preliminary hearing. But she informed the court that she "represent[s] [D.L.] in the underlying dependency matter only" and that D.L. "has not reached out to me to request counsel for the termination."

mental health issues, lack of safe and stable housing, and failure to engage in any parenting skills classes.

Based on Naweli's testimony, the court found that the Department met its burden to show that it offered D.L. all necessary services and that she did not follow through or maintain consistent engagement with the services.  The court specifically found that D.L. "continues to have untreated mental health issues [and] substance use issues," never "addressed any parenting skills or parenting deficiencies," and "has not maintained consistent visitation with the children."  The court concluded that D.L. is unfit to parent the children and that there was little likelihood that her parental deficiencies would allow the children to be returned to her in the near future.  The court issued a "Hearing, Findings, and Order Regarding Termination of Parent-Child Relationship" as to each child and a default order terminating D.L.'s parental rights to C.M.L. and C.S.S.

A couple of hours after the hearing, D.L. texted Naweli.[9]  D.L. said that she was "having issues with her phone" and "wanted to check in about court."  Naweli asked if she could call D.L. later and D.L. responded, "Yes what time is court."  Naweli replied that court was at 9:00 a.m.  D.L. told Naweli that "she thought the hearing was at 2 [p.m.] but realized that she was thinking of her doctor appointment."  Naweli then arranged to meet with D.L. two days later at a location D.L. chose.

---

[9] The record shows that the hearing began at 9:00 a.m. on December 5, 2022. D.L. texted Naweli at 11:24 a.m.

On December 7, 2022, Naweli arrived at D.L.'s suggested location for the meeting, but D.L. did not show up. Naweli called D.L., who answered and said she would like to meet at a different location. Naweli drove to the new location, but again, D.L. did not appear. Over the next 45 minutes, Naweli called and texted D.L. several times, but D.L. never responded. Eventually, Naweli texted D.L. that she had to leave but could meet the next week on December 12. D.L. responded that she could meet at that later date. On December 12, 2022, Naweli called D.L. to confirm their meeting, but D.L. did not respond.

More than a week later on December 21, D.L. texted Naweli, "apologizing for not staying in touch." Naweli then called D.L. and explained that the court terminated her parental rights. D.L. asked Naweli for her dependency attorney's contact information, which Naweli provided.

On December 29, 2022, D.L.'s dependency attorney filed a notice of appearance in the termination matter. And on January 10, 2023, D.L. moved to vacate the default termination order for mistake and excusable neglect. D.L. argued that CR 60(b)(1) required the court to vacate the default termination order because her dyslexia prevented her from meaningfully processing the notice of hearing and summons. She also asserted that the default proceedings violated her due process right to a meaningful opportunity to participate at the hearing.

D.L. summitted a declaration with her motion, admitting that Naweli personally served her with the petitions and summons but that she has "disabilities that interfered with [her] ability to understand the Notice of Hearing, when the hearing was, and what [she] needed to do." She said she suffers from

dyslexia and was on an individual education plan in school because of that disability.  And D.L. said she missed the December 5 hearing because "I got my dates mixed up."

The Department responded, arguing that D.L. was not entitled to relief under CR 60(b)(1) because she failed to show excusable neglect or mistake and failed to present a prima facie defense to the termination action.  The Department also argued that the court's default judgment proceedings satisfied due process.

On January 25, 2023, the court heard the motion to vacate.  At the beginning of the hearing, D.L.'s attorney argued that ICWA mandated reopening the case.  She argued that the Turtle Mountain Band of Chippewa Indians concluded that the children were not eligible by "blood quantum," but under their bylaws, the children are eligible for membership in the tribe by "linear descent of enrolled members."  The court rejected that argument as speculation.  D.L. then argued that the State "cannot prove that she relapsed" and that her disability warranted relief from the default.

The court denied the motion to vacate, concluding that D.L. failed to show substantial evidence of a prima facie defense and showed insufficient evidence of excusable neglect.  The court found that D.L. acted with due diligence in moving to vacate the default order but concluded that "it doesn't negate the weight to be given to the other factors."  Finally, the court concluded that "it is really clear . . . there will be a substantial hardship, in terms of permanency, to the children," and that "when the rights of the children and the rights of the

8

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/9

parents are in conflict, the rights of the parents must give way to the best interests of [the] child."

D.L. appeals.[10]

ANALYSIS

D.L. argues (1) the Department should have notified her of the default hearing under CR 55(a)(3), (2) due process required her termination summons to explain that her dependency attorney did not also represent her in the termination proceedings, and (3) the CR 60(b)(1) factors compelled the trial court to vacate the default order. We address each issue in turn.

1. <u>CR 55(a)(3)</u>

D.L. argues we should reverse the default termination order because she received no notice of the default proceeding as required under CR 55(a)(3). We disagree.

Whether a party has a right to notice of a motion for default is a question of law that we review de novo. <u>In re Welfare of S.I.</u>, 184 Wn. App. 531, 539, 337 P.3d 1114 (2014). "CR 55(a) controls entry of an order of default and default judgment." <u>Id.</u> A party may move for default when the opposing party "has failed to appear, plead, or otherwise defend as provided by these rules." CR 55(a)(1). Under CR 55(a)(3),

> [a]ny party who has appeared in the action for any purpose shall be served with a written notice of motion for default and the supporting affidavit at least [five] days before the hearing on the motion. Any

---

[10] D.L. filed four separate appeals of the termination orders, default order, and the order denying her motion to vacate the default termination order. We consolidated the appeals under No. 84852-6-I.

> party who has not appeared before the motion for default and
> supporting affidavit are filed is not entitled to a notice of the motion.

One "appears in an action when he or she answers, demurs, makes any application for an order therein, or gives the plaintiff written notice of his or her appearance." RCW 4.28.210.

D.L. did not appear in the termination action. Still, she argues that because she appeared in the dependency proceeding, she was entitled to five days' notice of the motion for default in the termination proceeding under CR 55(a)(3).

Division Three of our court rejected that same argument in S.I. There, the mother appeared in a dependency action and sporadically participated in services that DSHS[11] offered. S.I., 184 Wn. App. at 535-36. DSHS filed for termination of the mother's parental rights. Id. at 536. The assigned caseworker personally served the mother with the termination petition and a notice and summons to appear at a hearing on the petition. Id. The mother did not file a notice of appearance in the termination matter or appear at the hearing. Id. at 536-37. A week later, DHSH moved for default, and the trial court entered a default termination order the same day. Id.

On appeal, the mother argued that entry of the order of default without five days' notice violated CR 55(a)(3). S.I., 184 Wn. App. at 539. Division Three held that the mother had no right to notice under CR 55 because her appearance in the dependency matter did not amount to an appearance in the termination

---

[11] Department of Social and Health Services.

10

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/11

proceeding.  Id. at 540-41.  The court explained that "an action to permanently terminate parental rights is a new proceeding and not an extension of the dependency action."  Id. at 540.  This is so because

> the purpose of a dependency proceeding and a termination proceeding are diametric:  A dependency proceeding seeks to provide services to a parent to correct parental deficiencies so as to reunify the parent-child relationship; whereas a termination proceeding seeks to permanently terminate the parent-child relationship.

Id.[12]

D.L. urges us to reject S.I.  She argues that S.I. improperly relied on In re Dependency of Hiebert, 28 Wn. App. 905, 627 P.2d 551 (1981), to conclude that a dependency and a termination are separate proceedings.  See S.I., 184 Wn. App. at 540-41.

The court in Hiebert held that a party may file a timely affidavit of prejudice to disqualify the judge in a termination proceeding when the same judge presided over the dependency because the termination proceeding is a separate action. 28 Wn. App. at 910-11, 908.  According to D.L., S.I. "inverted" Hiebert's logic because Hiebert focused "largely on the fact that termination constitutes so profound a deprivation that due process entitles the parent to 'new notice' of the proceedings."  But the relevant conclusion in Hiebert—that a termination action is a separate proceeding from the dependency action—is well settled law.  See In

---

[12] We adopted the reasoning of S.I. in an unpublished opinion, In re Dependency of W.L.S., No. 80010-8-I, slip op. at 6 (Wash. Ct. App. Mar. 2, 2020), https://www.courts. wa.gov/opinions/pdf/800108.pdf.

11

re Welfare of Martin, 3 Wn. App. 405, 410-11, 476 P.2d 134 (1970); In re Welfare of Gibson, 4 Wn. App. 372, 379, 485 P.2d 131 (1971).

D.L. offers no compelling reason for us to depart from S.I.  Because D.L. did not appear in the termination action, she was not entitled to five days' notice of the default proceeding under CR 55(a)(3).

2.  Due Process

D.L. argues that the Department violated her due process rights by failing to adequately advise her of her right to an attorney.  We disagree.

"No person shall be deprived of life, liberty, or property, without due process of law."  WASH. CONST. art. I, § 3.  Due process in the termination context "requires that parents have notice, an opportunity to be heard and defend, and the right to be represented by counsel."[13]  In re Welfare of L.R., 180 Wn. App. 717, 723, 324 P.3d 737 (2014).  In determining whether a parent has received due process, we must balance (1) the parent's interests, (2) the risk of error created by the procedures used and the likely value of additional safeguards, and

(3) the state's interests.  In re Dependency of C.R.B., 62 Wn. App. 608, 614-15, 814 P.2d 1197 (1991) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).  We review whether a proceeding violates due process de novo.  In re Welfare of J.M., 130 Wn. App. 912, 920, 125 P.3d 245 (2005).

---

[13] Terminations are civil proceedings, so the right to counsel guaranteed by the Sixth Amendment to the United States Constitution does not apply.  In re Welfare of S.E., 63 Wn. App, 244, 249, 820 P.2d 47 (1991).

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/13

Parents have a fundamental liberty interest in the care and custody of their children, protected by the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington Constitution.  In re Dependency of V.R.R., 134 Wn. App. 573, 581, 141 P.3d 85 (2006).  As a result, state law guarantees a parent the right to counsel in termination proceedings.  Id.; RCW 13.34.070(3), .180(6).  On the other hand, the Department "has a strong interest in protecting the rights of the children, which includes a speedy resolution of the termination proceeding."  L.R., 180 Wn. App. at 727.  That interest is " 'not only in establishing a stable and permanent home for the child, but also in doing it as soon as possible.' "  Id. (quoting C.R.B., 62 Wn. App. at 615).  Given D.L.'s and the Department's competing interests here, the second factor (whether adequate safeguards exist to protect a parent's liberty interests) is dispositive.

A parent's right to counsel in dependency and termination proceedings arises under RCW 13.34.090.  In re Dependency of E.P., 136 Wn. App. 401, 404-05, 149 P.3d 440 (2006).  That statute provides:

> At all stages of a proceeding in which a child is alleged to be dependent, the child's parent, guardian, or legal custodian has the right to be represented by counsel, and if indigent, to have counsel appointed for him or her by the court.  Unless waived in court, counsel shall be provided to the child's parent, guardian, or legal custodian, if such person (a) has appeared in the proceeding or requested the court to appoint counsel and (b) is financially unable to obtain counsel because of indigency.

RCW 13.34.090(2).  The statute creates both a right to be represented by counsel and an obligation to appoint counsel should a parent appear in a proceeding unrepresented.  See In re Welfare of G.E., 116 Wn. App. 326, 333,

13

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/14

65 P.3d 1219 (2003) (appearance triggers the court's duty to provide counsel; a parent need not request appointment of counsel). Our Supreme Court has held that RCW 13.34.090 "fulfills all of the requirements of due process" in the dependency context. In re Welfare of Key, 119 Wn.2d 600, 611, 836 P.2d 200 (1992).

Parents are advised of their right to counsel in termination proceedings by way of a summons. RCW 13.34.070. Under RCW 13.34.070(2) and (3), the Department must serve the parent with the termination petition and a summons, which "shall advise the parties of the right to counsel." The summons "shall also inform the child's parent, guardian, or legal custodian of his or her right to appointed counsel, if indigent, and of the procedure to use to secure appointed counsel." RCW 13.34.070(3). Under RCW 13.34.180(6), the petition must include, "in substantially the following form," notice that the parents

> "have the right to have a lawyer represent you at the hearing. A lawyer can look at the files in your case, talk to the [D]epartment . . . or other agencies, tell you about the law, help you understand your rights, and help you at hearings. If you cannot afford a lawyer, the court will appoint one to represent you. To get a courtappointed lawyer you must contact:   (explain local procedure)  ."

Here, D.L.'s caseworker served her with the termination petitions and a summons that contained the required statutory language. The summons advised D.L.:

> • You have the right to be represented by a lawyer. If you cannot afford a lawyer, you have the right to request that the court appoint a lawyer to represent you at public expense. If you qualify, a lawyer will be appointed by the court to represent you.

14

- Your lawyer can look at the social and legal files in your case, talk to the supervising agency or other agencies, tell you about the law, help you understand your rights and help you at hearings.

- If you wish to have a lawyer appointed, contact the **Snohomish County Office of Public Defense** by telephone at 425-388-3500, or at 3000 Rockefeller First floor, Room #C-103, Everett, WA 98201.

Still, D.L. argues that the language in her summons does not satisfy due process. According to D.L., the language is a "vague advisement" that "overestimated [her] legal sophistication." She complains that the summons "said nothing about dependency counsel" and that there was "no reason for [her] to infer, without specific direction, a need to formally retain the attorney who had already represented her." But D.L.'s summons clearly advised her that she had the right to a lawyer and explained the steps she must take to obtain one. And as much as she may have been confused about the process, the statute provides a safeguard. Had D.L. appeared at the preliminary hearing, the court was statutorily required to appoint her a lawyer. Indeed, D.L.'s dependency attorney was present at the hearing and stood ready to represent D.L. if she appeared and requested appointment.

D.L. fails to show that current safeguards do not adequately protect a parent's due process right to counsel in termination proceedings.

### 3. CR 60(b)(1)

D.L. argues the trial court abused its discretion by denying her motion to vacate under CR 60(b)(1) for mistake or excusable neglect. We disagree.

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/16

Default judgments are not favored in the law. Gage v. Boeing Co., 55 Wn. App. 157, 159, 776 P.2d 991 (1989). Still, the Department may obtain a judgment terminating a parent's right to the custody of their child if the parent fails to respond to notices and summons of the proceeding to terminate their rights. C.R.B., 62 Wn. App. at 616. This is because "a child's right to a stable home cannot be put on hold interminably because a parent is absent from the courtroom and has failed to contact his or her attorney." Id. But before the court can enter a default judgment terminating parental rights, it must have a meaningful hearing on the merits of the case in accordance with the statutory requirements for termination. Id.

Under CR 60(b)(1), "the court may relieve a party or the party's legal representative from a final judgment, order, or proceeding for . . . [m]istakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order." We will not disturb a trial court's decision on a motion to vacate a default judgment absent an abuse of discretion. White v. Holm, 73 Wn.2d 348, 351, 438 P.2d 581 (1968). A trial court abuses its discretion "when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons." Fowler v. Johnson, 167 Wn. App. 596, 604, 273 P.3d 1042 (2012). If the decision to deny a motion to vacate is based on tenable grounds and is within the bounds of reasonableness, we must affirm. In re Est. of Stevens, 94 Wn. App. 20, 30, 971 P.2d 58 (1999).

16

A party seeking to vacate a default judgment must show (1) that there is substantial evidence supporting a prima facie defense, (2) that the failure to timely appear and answer was due to mistake, inadvertence, surprise, or excusable neglect, (3) that the defendant acted with due diligence after notice of the default judgment, and (4) that the plaintiff will not suffer a substantial hardship if the court vacates the default judgment. TMT Bear Creek Shopping Ctr., Inc. v. PETCO Animal Supplies, Inc., 140 Wn. App. 191, 212, 165 P.3d 1271 (2007). The first two factors are primary and the other two are secondary. Id. at 200-01. The "factors are interdependent," so the proof that a moving party must show "on any one factor depends on the degree of proof made on each of the other factors." Norton v. Brown, 99 Wn. App. 118, 124, 992 P.2d 1019 (1999).

If the moving party shows a " 'strong or virtually conclusive defense,' " the court will spend little time inquiring into the reasons for the failure to appear and answer, provided the party timely moved to vacate and the failure to appear was not willful. TMT, 140 Wn. App. at 205[14] (quoting Johnson v. Cash Store, 116 Wn. App. 833, 841, 68 P.3d 1099 (2003)). Relieving a party from a default judgment that has a strong or virtually conclusive defense serves equitable principles that ensure " 'substantial rights are preserved and justice is done.' " Id. at 204-05 (quoting Johnson, 116 Wn. App. at 841). But when the moving party's evidence supports no more than a prima facie defense, the court will scrutinize the reasons for the failure to timely appear with greater care. Id.

---

[14] Internal quotation marks omitted.

17

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/18

A. Prima Facie Defense

D.L. argues that the trial court erred by finding she failed to show a prima facie defense. We disagree.

The party seeking to vacate a default judgment must show "that there is substantial evidence supporting a prima facie defense." Little v. King, 160 Wn.2d 696, 703-04, 161 P.3d 345 (2007). To determine whether evidence supports a prima facie defense, "the trial court must take the evidence, and reasonable inferences therefrom, in the light most favorable to the movant." Pfaff v. State Farm Mut. Auto. Ins. Co., 103 Wn. App. 829, 835, 14 P.3d 837 (2000). A CR 60 movant shows a prima facie defense when they produce evidence that, if believed by the trier of fact, would amount to a defense to the claims presented. Id. at 835-36. So, a parent may show a prima facie defense by challenging the State's ability to meet its burden of proof under the termination statute, RCW 13.34.180.

A trial court may terminate parental rights when the Department establishes the statutory elements of RCW 13.34.180(1)(a) to (f) by clear, cogent, and convincing evidence. In re Parental Rights to K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016); RCW 13.34.190(1)(a)(i). Those elements are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the

18

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/19

> parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>      (e)    That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>         . . . and
>      (f)    That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). The Department must also prove by a preponderance of the evidence that termination of the parent-child relationship is in the child's best interests. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190(1)(b).

On appeal, D.L. argues she showed a prima facie defense against termination by explaining that she "had disabilities including, at least, dyslexia," and that the Department did not properly investigate and tailor services to her disabilities. But D.L. offered no evidence of this defense at the hearing on the motion to vacate. D.L. did not allege in her declaration that the Department's investigation into her disabilities was inadequate, that the Department did not offer sufficient services, or that her dyslexia prevented her from meaningfully participating in those services. Instead, her declaration in support of vacating the termination order addressed only the reasons she failed to appear at the December 5 preliminary hearing. It said:

> I have disabilities that interfered with my ability to understand the Notice of Hearing, when the hearing was, and what I needed to do. . . . I suffer from dyslexia. . . . When I was a student in school, I was on an IEP (Individual Education Plan) because of this disability.

Nothing in D.L.'s declaration amounts to a prima facie defense to the petitions to terminate her parental rights.

19

No. 84852-6-I (consol. with Nos. 84853-4-I, 85000-8-I, 85001-6-I)/20

D.L. also argues she "raised a prima facie defense related to ICWA and WICWA" by arguing that the Turtle Mountain Band of Chippewa Indians erred in determining her children were not eligible for membership by blood quantum because the tribe's bylaws state that the test for eligibility is by lineage. But it is solely for the tribe to determine tribal membership eligibility. In re Dependency of Z.J.G., 196 Wn.2d 152, 175, 471 P.3d 853 (2020); In re Dependency of A.L.W., 108 Wn. App. 664, 671-72, 32 P.3d 297 (2001). And the record shows the tribe determined that the children were not members or eligible to become members.

### B. Excusable Neglect

Even if D.L. had set out a prima facie defense to the termination petitions, she did not show that her failure to appear at the December 5 hearing resulted from excusable neglect.

D.L. says she struggled to understand the summons because of dyslexia. But her caseworker personally served her with the termination petitions and a summons to appear at the termination hearing. The summons informed D.L. that the Department was seeking termination of her parental rights to C.M.L. and C.S.S., and that the court scheduled a preliminary hearing on termination for December 5, 2022 at 9:00 a.m. It warned her several times to appear—"You should appear at this hearing," "***You are summoned and required*** to appear at the hearing," "A termination Petition, if granted, will result in permanent loss of your parental rights," "If you do not appear ***the court may enter an order in your absence*** . . . [p]ermanently terminating your parental rights." When giving

20

D.L. the summons, Naweli "pointed out the date of the hearing." Naweli told D.L. that "she could appear at the hearing via Zoom and asked [her] for a good e[-]mail address." D.L. gave Naweli an e-mail address and never expressed confusion about the date of the hearing.

On November 1, 2022, Naweli sent D.L. a service letter via e-mail that included the hearing date and time and "information on how to access the hearing." And on November 30, 2022, Naweli sent D.L. an e-mail with the date and time of the preliminary hearing, the Zoom link, and the call-in information for the hearing. Naweli also called D.L.'s last known phone number and left a voice mail, asking for a return call. She then texted D.L. that she had e-mailed her the hearing link.

Finally, when D.L. called Naweli and asked about court, she did not tell the caseworker that she did not understand the summons because of dyslexia. Instead, she texted Naweli "to check in about court" because she was "having issues with her phone." And she told Naweli that she mixed up the time with her doctor's appointment that afternoon. D.L.'s declaration attached to her motion to vacate also explains that she "got [her] dates mixed up." Forgetting the time of a termination hearing after formal notice and several reminders does not amount to excusable neglect. See S.I., 184 Wn. App. at 544 (mother's failure to read the termination petition and summons after her caseworker personally served her was not excusable neglect).

D.L. argues that this case is like In re Parental Rights to C.E.C.L., No.

21

84156-4-I (Wash Ct. App. Apr. 10, 2023) (unpublished), https://www.courts.

wa.gov/opinions/pdf/841564.pdf.  In that case, the Department petitioned to

terminate the father's parental rights.  Id., slip op. at 1.  Though the father was "in

regular contact with his dependency attorney," the Department failed in its

attempts to serve him.  Id., slip op. at 7, 1.  So, the Department moved to serve

him by publication, which the court granted.  Id., slip op. at 1-2.  The Department

then served notice by publication in the Daily Journal of Commerce.[15]  Id., slip

op. at 7.

When the father failed to appear at the termination hearing, the

Department moved for an order of default.  C.E.C.L., No. 84156-4-I, slip op. at 2.

The court then held a default termination hearing, heard testimony from the

father's caseworker, and granted the termination petition.  Id.  Shortly after the

hearing, the father appeared and moved to vacate under CR 60.  Id.  The trial

court denied his motion.  Id.  We reversed, concluding that the father showed

evidence of a prima facie defense.  Id., slip op. at 1, 6.  And we concluded that

the trial court "failed to consider mistake or excusable neglect" despite an error in

proper service and service by publication, a method of service unlikely to reach

the father.  Id., slip op. at 7.

---

[15] The Department also mailed the summons and termination petition to the
father's last known address, but "it previously had declared his whereabouts were
unknown."  C.E.C.L., No. 84156-4-I, slip op. at 1-2.  And under a local court rule, the
Department e-mailed the documents to the father's dependency attorney, but the
attorney "had 'missed' and not opened or read the e[-]mail."  Id., slip op. at 2.

D.L.'s case is different.  D.L. presents no evidence in support of a prima facie defense.  Further, the Department properly served her with a summons.  Indeed, D.L. received personal service of the termination petitions and summons, received several reminders about the hearing, and never indicated confusion about how to access the hearing.  D.L. cannot show her absence resulted from excusable neglect.

### C.  Due Diligence

D.L. argues that she acted with due diligence.  The State agrees.  The record shows that D.L. contacted her dependency attorney on December 22, 2022, less than a month after the termination.  The attorney then promptly entered an appearance in the termination and moved to vacate the default order. This secondary factor supports granting D.L.'s motion to vacate.

### D.  Substantial Hardship

D.L. argues that the State would not suffer substantial hardship if we vacated the default judgment.  If we did so, the matter would proceed to a termination trial.  See Pfaff, 103 Wn. App. at 836.  But that alone is not a substantial hardship for purposes of CR 60(b)(1).  Id.  This secondary factor also supports D.L.'s motion to vacate.

### E.  Equity

Finally, D.L. argues that equity demands we set aside the default termination order.  A CR 60(b)(1) determination to set aside a default judgment "is not a mechanical test," but "a matter of equity."  Little, 160 Wn.2d at 703-04. Our overarching concern when reviewing a trial court's decision on a motion to vacate "is whether that decision is just and equitable."  TMT, 140 Wn. App. at

23

200. That is because " '[j]ustice is not done if hurried defaults are allowed, but neither is it done if continuing delays are permitted.' " Id. (quoting Johnson, 116 Wn. App. at 841). So, we employ an equitable analysis to determine what is proper " 'by the facts of each case, not by a hard and fast rule applicable to all situations.' " Id.[16] (quoting Little, 160 Wn.2d at 703).

Here, the equities support the trial court's decision denying D.L.'s motion to vacate. At termination, the State and the children share an interest " 'not only in establishing a stable and permanent home for the child, but also in doing it as soon as possible.' " L.R., 180 Wn. App. at 727 (quoting C.R.B., 62 Wn. App. at 615). The Department removed D.L.'s children from her custody in May 2021, more than a year and a half before the termination proceeding. Vacating the termination order would cause more delay and disruption to the children's interest in a stable and permanent home. Starting the termination process anew would be a hardship for the children and a barrier to permanency.

The primary factors under CR 60(b)(1) and equitable consideration of all the factors weigh against vacating the default termination. The trial court did not abuse its discretion by denying D.L.'s motion to vacate.

We affirm the order denying D.L.'s motion to vacate the default order terminating her parental rights to C.M.L. and C.S.S.

---

[16] Internal quotation marks omitted.

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Brenner, J

WE CONCUR: